UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROGER WAYNE MCGOWEN, | § | |
| | § | |
|       Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. H-06-3182 |
| | § | |
| RICK THALER, | § | |
| | § | |
|       Respondent. | § | |

**<u>MEMORANDUM AND ORDER</u>**

Roger Wayne McGowen, a Texas inmate incarcerated under a capital conviction and death sentence, has filed a federal petition for a writ of habeas corpus. McGowen's petition claims that error infected both his conviction and sentence. Respondent seeks summary judgment. For the reasons discussed below, the Court finds that constitutional error in the punishment phase jury instructions require that Texas either (1) commute his sentence to one of life imprisonment or (2) hold a new sentencing hearing. This Court's review of the record, the pleadings, and the law, however, shows that habeas relief is unavailable with respect to McGowen's conviction. The Court will discuss the reasons for these rulings at length below.

## BACKGROUND

On March 11, 1986, a masked assailant shot Marion Pantzer while he attempted to rob a bar she owned in Houston. Shortly before the murder an African-American male entered the "Just Marion and Lynn's Club" in Houston. The bartender, Pedro Flores, noted that the man's presence was unusual, as the club catered to a lesbian clientele. After playing pool for a few minutes, the man – later identified as McGowen's cousin Kerwin Kindle – left.

At around 12:45 a.m., a man wearing a ski mask and carrying a long-barreled gun entered the bar. The gunman wordlessly motioned his weapon at Mr. Flores, which he understood as a

demand for the money in the cash register.  His stance, described by Mr. Flores as being in a "shooting position," left no question but that a robbery was in progress.

As Mr. Flores started walking toward the cash register, he noticed Ms. Pantzer sitting at the end of the bar talking to an employee.  Ms. Pantzer slowly reached for the gun she usually had tucked into her pants.  The next moments were ones of violent confusion.  Mr. Flores opened the cash register, he saw Ms. Pantzer draw her weapon, he saw fire come from the gunman's pistol, and he then heard two shots.  Ms. Panzer fell from her chair as the gunman fled.  In the confused moments, Mr. Flores could not tell who had shot first.

The police did not arrive for about thirty minutes.  Before they came, Kindle reentered the bar.  Kindle lingered during the subsequent crime scene investigation.  The police initially recovered Ms. Pantzer's weapon and a spent bullet casing on the floor near her body.  The medical examiner later removed a hollow-point bullet from her body.  The police, however, did not recover the bullet fired by Ms. Pantzer until Kindle pointed it out to them.

The police initially did not have any good leads on the gunman's identity, though they pursued several lines of investigation.  The robbery and murder at the "Just Marion and Lynn's Club" was similar to several other crimes in the immediate vicinity.  A group of men had targeted homosexual bars, adult entertainment establishments, and other businesses in the nearby area.  Investigation divulged that a license plate number from a similar robbery approximated that of McGowen's car. McGowen, who already had a history of armed robbery, became a suspect in several crimes.  A witness from an aggravated robbery identified McGowen from a photo array.  The police obtained an arrest warrant for McGowen.

On April 29, 1986, the police arrested McGowen at his apartment, which was located only a half mile from the "Just Marion and Lynn's Club."  The police told him that he was under

arrest for one robbery, and a suspect in several others.  A search of his apartment turned up evidence that incriminated him in other crimes, but not in the murder of Ms. Pantzer.  The police took him to the station for questioning.

The police informed McGowen of his constitutional rights before interviewing him. Initially, McGowen denied any involvement in robberies or any knowledge of the murder, but instead accused Kindle of committing those crimes.  After about an hour and a half, McGowen signed a written statement admitting to his involvement in several robberies.[1]

The police then questioned McGowen about the murder.  McGowen initially blamed Kindle, but confessed when the police pointed out that Kindle had returned to the crime scene and found a bullet.  McGowen admitted that he had murdered Ms. Pantzer, though he qualified

---

[1]      McGowen's written statement said, in part:

> I am giving this statement to Sergeant Maxey about some robberies that I have been involved in the last few months. Sergeants Maxey and Kennedy have also questioned me about a murder case they are working on but I do not know anything about it. I have done a few robberies but I have never harmed anyone. This all started about three months ago. My cousin, Kerwin Kendal [*sic*], is living with me at my apartment at 1341 Castle Court # 203. He has been living with me for about six or seven months. Kerwin has some kind of .38 revolver, but I do not know what kind it is. It is a dark colored gun. I do not know what the date was, but Kerwin and I walked over to The Outlaws club on Richmond Street. It is only a few blocks from my house. We had the .38 with us. I was carrying the gun and we just walked right in and robbed the place. I do not remember how many people were inside. I guess we got about two or three hundred a piece. The next robbery that I did was at The Briar Patch Lounge, I was by myself. I had been in there before [having] a drink. This time I went in and had a drink. I then left and came back in. I had a bandana over my face and I robbed the bartender. I do not remember how much money I got, but it was at least a couple of hundred dollars. I had parked my car around the corner and I left in it.
>
> I obtained a sawed off shotgun from a guy in a trade for some marijuana. I do not know the name of this guy. I got this gun sometime after the Briarpatch robbery. This is the same shotgun that the sergeants found in my car. The next robbery that I did I was again by myself. It was at the Studz News on Alabama. I drove there in my car and parked around the corner. I had the shotgun and a red [bandana] over my face. I robbed the employee, but I do not remember how much money I got. I robbed the Studz again a couple of weeks later also by myself and with the shotgun. I think the same employee was working. The last robbery that I did was at The Copa. It was me and Kerwin, and we were in my car.
>
> I had on one of the white hats that Sergeants Maxey and Kennedy found in my apartment this evening. Kerwin went inside first and checked the place out. When he came out, I went in with a .38. As soon as I came in the door, the employee ran. I tried to open the register, but it would not open. I walked back out, and we left in my car.
>
> This is all the robberies that I did. I do not know if Kerwin has done some others with other people or not. I have been through the twelfth grade, and I can read and write with no problems.

Tr. Vol. 36, State's Exhibit 5.  This statement did not come before the jury until the punishment phase.

that he only fired because she shot at him.  A police officer summarized McGowen's confession

into a written statement that McGowen signed.  The statement provided the following account of

the crime:

> Prior to making this statement, I have been warned by Sergeant R.L. Maxey.  I am giving this statement to Sergeant Maxey in regards to a shooting I was involved in. I do not remember what date it was, but it was a couple of months ago, My cousin, Kerwin, and I went to a bar on Richmond street just on the other side of Montrose.  We went there to rob it.  We went in Kerwin's car, which is a '75 or '76 Monte Carlo.  It is brown.  Kerwin parked his car down a side street from the bar.  I got out of the car.  I had a .38 revolver and a gray ski mask.  I had the ski mask over my face.
>
> When I walked in the bar, I saw an older white lady sitting by the bar.  She stood up and started walking towards me.  I started to walk towards her.  All of a sudden, she came up with a gun, and she fired a shot at me.  I did not see where she got the gun from, and I was not expecting it.  As soon as I saw the gun, I started backing up, trying to get away,  She then fired at me one time.  I guess it was just a frightened reaction by me, but my gun went off. I did not even know if I had hit her because I kept running out of the club.
>
> I ran to the car, and Kerwin and I drove back to the apartment. Sergeant Maxey has told me that Kerwin went back inside the club and talked to the police officers, but I did not know Kerwin did that.  He told me he was going to drive by, but I did not know he went inside.  That same night, I gave Kerwin the gun.  I do not know what he did with it.
>
> I want to say that I did not go in the club to hurt anyone.  If the woman had not shot at me, I would not have gotten so scared and my gun would not have gone off.

The State of Texas charged McGowen with capital murder committed in the course of an

attempted robbery.  Trans. at 3, 5, 12.  A grand jury also indicted McGowen and Kindle for

aggravated robbery.  Trans. at 3.  McGowen stood trial in the 339th District Court, Harris

County, Texas.   The trial court appointed Ronald Mock and George Godwin to represent

McGowen.[2]

Trial counsel's early strategy was to attack the only evidentiary factor that linked McGowen to the murder – his confession. Eyewitnesses had provided conflicting and vague accounts of the gunman. No physical evidence remained to link McGowen to the crime. The police never recovered the murder weapon. No one came forward to relate incriminating statements by the shooter. McGowen's confession was the only connection between him and the crime, though it was a strong one. Trial counsel's best chance in representing McGowen was to keep his police statements from coming before the jury.[3]

Trial counsel filed a "Motion for Hearing on Voluntariness of any Admission or Confession Whether Written or Oral." Trans. at 57. Trial counsel made general arguments, such as that McGowen was "substantially deprived of his freedom by the attendant conduct of the officers and the surrounding circumstances." Trans. at 57. The motion itself, however, did not give any strong reason for the suppression of his statements.

On May 14, 1987, four days before trial, the trial court held a hearing on the voluntariness of McGowen's confession. The police officers testified that they read McGowen's rights and assured that he knowingly and voluntarily confessed. McGowen also testified. He hinted that he had been using drugs in the hours before confessing. He explained that he had felt nervous, scared, and intimidated when he confessed. He claimed that the police never read him

---

[2]      Unless necessary to identify one attorney, the Court will generally refer to McGowen's trial lawyers as "trial counsel."

[3]      McGowen himself recognized the importance of challenging his confession. On October 28, 1986, several months before trial, McGowen filed a *pro se* "Motion for Judgment of Acquittal," asking the trial court to "instruct the jury to return a finding of 'not guilty.'" Trans. at 20. McGowen based his argument on "the subject of primary importance . . . whether or not the Defendant is the person who committed the offense." Trans. at 20-21. McGowen argued that an eyewitness identified the killer as "being between 5'8" and 5'9" and weighing 160 to 170 pounds, and was seen driving away from the scene in a Grey colored car. Yet the witness in the above cause number has picked out Roger Wayne McGowen as being the one who committed capital murder. The defendant is 5'7" and weighs 139 pounds and owns a 1977 Green Oldsmobile. Defendant knows of no one that owns a Grey car." Trans. at 21.

his rights.  Trial counsel's questioning emphasized that the police violated state law because they did not take McGowen before a state magistrate before he gave his statements.  The hearing, however, did not show any police overreaching, coercion, or malfeasance.

The trial court orally denied the motion to suppress.  The trial court subsequently issued findings of fact and conclusions of law denying McGowen's attempt to suppress the confession.  The trial court found no problem with the manner in which the police took McGowen's two statements. The trial court concluded that McGowen's two statements "were voluntary, given after being properly informed by the officers, and made after knowingly and intelligently waiving the rights afforded to a defendant in custody."  Trans. at 170.  Specifically, the trial court found: "There was no force, threats, coercion, or tricks used on the defendant, and there were no inducements or promise made to the defendant to cause him to make either statement."  Trans. at 169.  The trial court recognized that it would have been better practice for the police to take him before a magistrate to receive his warnings, "but the failure of the police to do so does not invalidate his two statements[.]"  Trans. at 171.

The best hope for securing an acquittal was no longer available to the defense.  Trial counsel thus adopted a strategy which, while still hinting that problems existed with the confession, would focus on McGowen's mental state when he fired the killing shot.  In essence, trial counsel challenged the intent requirement for capital murder by arguing that he only responded in self-preservation when Ms Pantzer shot at him.  Given McGowen's confession to the murder, trial counsel chose not to challenge his identity.

The guilt/innocence portion of McGowen's trial lasted one day.  The prosecution called witnesses to describe the circumstances of the crime and Ms. Pantzer's death.  The prosecution relied on McGowen's statement to prove his guilt. The jury found him guilty of capital murder.

In a separate punishment hearing, then-applicable Texas law required the jury to answer three special issue questions:

<u>Special Issue No. 1</u>

Was the conduct of the defendant, Roger Wayne McGowen, that caused the death of the deceased committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

<u>Special Issue No. 2</u>

Is there a probability that the defendant, Roger Wayne McGowen, would commit criminal acts of violence that would constitute a continuing threat to society?

<u>Special Issue No. 3</u>

Was the conduct of the defendant, Roger Wayne McGowen, in killing the deceased unreasonable in response to the provocation, if any, by the deceased ?

Trans. at 183-85.

The prosecution presented a strong, almost overwhelming, punishment case against McGowen. The prosecution brought forth witness after witness who testified about McGowen's lawlessness and violence. The police charged McGowen with aggravated robbery in 1982. Imprisonment did not halt his lawlessness. Thereafter, McGowen sustained himself through stealing. Along with several others, McGowen perpetually was involved in armed robbery, sometimes stealing from the same business repeatedly. McGowen and an accomplice had robbed one establishment approximately ten times. McGowen had used both guns and knives while engaging in crime. McGowen had agreed to kill another man in exchange for drugs, but had only robbed and shot him. The prosecution convincingly argued that the only way to stop McGowen's escalating criminality was for the jury to return a death sentence.

As the Court will discuss at length below, the defense made a feeble effort to secure favorable answers to the special issues. The defense called McGowen's two sisters as its only

punishment phase witnesses.  McGowen's sisters described his poor, disadvantaged upbringing and provided information about his good character.  Trial counsel used their testimony both to seek mercy and to help explain why McGowen had chosen to live without regard for the law.

The jury answered the special issues in a manner requiring the imposition of a death sentence.[4]

The Court of Criminal Appeals affirmed McGowen's conviction and sentence on direct appeal in 1991.  *McGowen v. State*, No. 69,855 (Tex. Crim. App. Dec. 2, 1991) (unpublished). Importantly, the Court of Criminal Appeals rejected McGowen's claim that the jury could not adequately consider his mitigating evidence.

McGowen filed a state habeas application in 1996.  McGowen's initial state habeas application raised two issues: (1) the trial court should have instructed the jury on the lesser-included offense of simple murder and (2) trial counsel should have retained an expert to perform a "biopsychosocial assessment" for use in the punishment phase.  State Habeas Record at 2-18.  In 1997, McGowen filed an amended state habeas application raising several new claims, including that trial counsel inadequately investigated his innocence.  State Habeas Record at 26-78.  The state habeas court ordered McGowen's trial attorneys to prepare affidavits explaining their efforts in his defense.  After the State filed a response, the state habeas court ordered supplemental briefing on McGowen's claim that trial counsel inadequately presented mitigating evidence.  State Habeas Record at 242.

The state habeas court's subsequent findings and conclusions addressed the merits of all claims from McGowen's initial and amended state habeas applications.  State Habeas Record at

---

[4]      McGowen filed a motion for a new trial which alleged, among other things, that "[t]he evidence is wholly insufficient to sustain a finding of guilty to the offense of capital murder without the confession which was illegally obtained and therefore, inadmissible[.]"  Trans. at 240.

391-410.  In 2006, the Court of Criminal Appeals adopted the findings and conclusions addressing the claims McGowen raised in his initial state habeas application and denied relief. The Court of Criminal Appeals, however, refused to consider the claims from McGowen's amended state habeas application:

> This Court has also reviewed a document entitled "Amended Application for Writ for Habeas Corpus."  Applicant presents ten allegations in this "amended" application. Because this document was filed after the deadline provided for an initial application for habeas corpus, we find it to be a subsequent application. *See* Art. 11.071. We further find that the allegations fail to meet one of the exceptions provided for in Section 5 of Article 11.071 and, thus, we dismiss this subsequent application as an abuse of the writ. In dismissing the subsequent application, we also expressly reject all findings and conclusions related to the claims presented therein.

*Ex parte McGowen*, WR-64,992-01 & 64,992-02 (Tex. Crim. App. Sep. 13, 2006).[5]

This federal action followed.  McGowen filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254.[6]  This Court stayed the federal proceedings while McGowen filed a successive state habeas action.  After the Court of Criminal Appeals dismissed McGowen's successive application as an abuse of the writ, *Ex parte McGowen*, No. WR-64,992-03 (Tex. Crim. App. Nov. 26, 2008), the Court reopened this case.  McGowen amended his petition.  McGowen raises sixteen claims in his amended federal habeas corpus petition:

1.    Texas' special issue questions did not provide an adequate vehicle for consideration of McGowen's mitigating evidence as required by *Penry v. Lynaugh*, 492 U.S. 302 (1989) and its progeny;

2.    The jury engaged in misconduct by considering extraneous information after the guilt/innocence phase;

3.    Trial counsel provided ineffective assistance by not adequately addressing juror misconduct;

---

[5]    Respondent occasionally refers to the rejected findings in his summary judgment motion,  (Instrument No. 33 at 45, 47), but only in the context of claims that are not available for federal review or are moot.

[6]    While McGowen's initial federal petition expresses some concern about timeliness under the Anti-Terrorism and Effective Death Penalty Act, Respondent does not argue that the petition is time barred.

4.      The evidence insufficiently supported the jury's affirmative response to the deliberateness special issue;

5.      The evidence insufficiently supported the provocation special issue;

6.      The trial court violated McGowen's rights by refusing to define the term "deliberately," as used in the first special issue;

7.      The Constitution requires Texas to offer a life-without-parole sentencing option;

8.      McGowen's death sentence violates the Constitution because his jury was not given the option to sentence him to life without parole;

9.      Subsequent legislative amendments to the future dangerousness special issue make McGowen's sentence invalid;

10.     Trial counsel provided ineffective assistance by not adequately investigating and presenting evidence of McGowen's innocence and mitigating evidence;

11.     McGowen is actually innocent of capital murder;

12.     The State violated the Constitution by not disclosing exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963);

13.     The length of McGowen's stay on death row constitutes cruel and unusual punishment;

14.     Texas' capital sentencing statute unconstitutionally affords the sentencing jury too much discretion;

15.     Texas' manner of execution amounts to cruel and unusual punishment;

16.     The cumulative effect of the alleged errors denied McGowen's constitutional rights.

Respondent seeks summary judgment on all McGowen's grounds for relief. Respondent argues that a procedural bar prevents federal consideration of several issues. Also, Respondent asserts that this Court cannot grant relief on any issues that McGowen did not exhaust in state court. Respondent argues that only claims one, four, five and six are fully available for federal review.

McGowen has spent over two decades on death row.  In those years, McGowen's *Penry* claim, which courts previously denied routinely, has become one that courts grant routinely.  As discussed at length below, developments in the way in which federal courts have considered Texas' manner of placing mitigating evidence before the jury require this Court to grant relief on McGowen's *Penry* claim.  Accordingly, the Court need not address the additional claims that relate to the punishment phase.  Specifically, only claims one, ten, eleven, twelve, and arguably sixteen relate to the guilt/innocence phase of McGowen's trial proceedings.[7]

## LEGAL STANDARDS

Habeas corpus review provides the federal courts with a limited examination of state criminal judgments.  While "the Framers considered the writ a vital instrument for the protection of individual liberty," *Boumediene v. Bush*, ___ U.S. ___. 128 S. Ct. 2229, 2246 (2008), federal courts traditionally rely on principles of finality, comity, and federalism to narrow the scope of federal habeas review.  *See Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993).  Recognizing "the profound societal costs that attend the exercise of habeas jurisdiction," *Smith v. Murray*, 477 U.S. 527, 539 (1986), "[t]he role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983).  "The States possess primary authority for defining and enforcing the criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights. Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights."  *Engle v. Isaac*, 456 U.S. 107, 128 (1982); *see also Calderon v. Thompson*, 523 U.S. 538, 555-56 (1998) ("Federal habeas

---

[7]     Some of McGowen's claims, such as his fourth and fifth, mention evidence from the guilt/innocence phase and argue that trial counsel should have better set the stage in the guilt portion of trial for the jury's determination of punishment.  His claims, however, only impact the jury's answers to the special issues, not its consideration of his guilt.

review of state convictions frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.") (quotation omitted); *McCleskey v. Zant*, 499 U.S. 467, 491 (1991) ("Our federal system recognizes the independent power of a State to articulate societal norms through criminal law; but the power of a State to pass laws means little if the State cannot enforce them.").

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") honors the traditional bounds of federal habeas review.   The AEDPA places primary importance on a State's adjudicative process, thus limiting the issues a federal court can consider on habeas review and the circumstances that merit habeas relief.   As a precursor to federal habeas review, an inmate must provide the state courts the first opportunity to consider his constitutional challenges.   *See* 28 U.S.C. § 2254(b)(1).   The AEDPA precludes federal review over unexhausted claims for any purpose other than to deny their merits.   *See* 28 U.S.C. § 2254(b)(2).   As a corollary to the exhaustion doctrine, federal practice general refuses to consider the merits of any claim that an inmate has failed to present in compliance with state procedural law.   *See Dretke v. Haley*, 541 U.S. 386, 392 (2004); *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997)*; Coleman*, 501 U.S. at 729.   If an inmate defaulted his claims when he attempted to exhaust them because he did not follow adequate and independent state procedural law, federal courts likewise cannot review the merits of his claims unless he meets demanding exceptions.

The same principles of comity, federalism, and finality that limit the scope of federal review  also generously defer to a State's resolution of factual and legal issues.   Placing primary emphasis on the State's consideration of constitutional issues, the AEDPA mandates a deferential review over those claims "adjudicated on the merits" in state court.   28 U.S.C. § 2254(d).   Federal habeas relief on exhausted and adjudicated claims only becomes available

when an inmate shows that the state decision was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1), (2).  In practice, this standard gives wide latitude to state courts.  Here, the state courts considered some of McGowen's claims, either directly or in the alternative after imposing a procedural bar.  To be "contrary to" federal precedent, McGowen must show: (1) the state court's conclusion is "opposite to that reached by [the Supreme Court] on a question of law" or (2) "the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  *Williams v. Taylor,* 529 U.S. 362, 413 (2000); s*ee also Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7-8 (2002).  To show that the state court unreasonably applied federal law, McGowen must prove it "identifie[d] the correct governing legal rule from [the Supreme Court] cases but unreasonably applie[d] it to the particular facts of the particular state prisoner's case" or "if the state court either unreasonably extend[ed] a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuse[d] to extend that principle to a new context where it should apply."  *Williams*, 529 U.S. at 407.

The AEDPA also provides substantial deference to a state court's resolution of factual issues.  The Texas Court of Criminal Appeals issued a comprehensive opinion on direct appeal.  On habeas review, the state district court made detailed and comprehensive fact findings after considering the record and the evidence presented by the parties (though not all survived appellate review).  Under 28 U.S.C. § 2254(d)(2) "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding[.]"  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  A federal habeas court must presume the underlying factual determinations of the state court to be correct, unless the petitioner "rebut[s]

the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Miller-El*, 537 U.S. at 341.

As a procedural matter, the unique nature of habeas cases modifies general civil practice. This action now comes before the court on Respondent's motion for summary judgment. Summary judgment is proper where the record shows "no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56. "As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). In ordinary civil cases, a district court considering a motion for summary judgment must construe disputed facts in a light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor"). However, a court must view a summary judgment motion through "the prism of the substantive evidentiary burden." *Id.* at 254. Congress, through the AEDPA, has constricted both the nature and availability of habeas review. The Rules Governing Section 2254 Cases in the United States District Courts, along with traditional habeas practice, also allow for the summary dismissal of habeas claims. This Court, therefore, applies general summary judgment standards only insofar as they do not conflict with the language and intent of the AEDPA or other habeas law. *See Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002) ("[Rule 56] applies only to the extent that it does not conflict with the habeas rules."), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004); Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts ("The Federal Rules of Civil Procedure, to the extent that they are not inconsistent with any statutory provisions or these rules, may be applied to a proceeding under

these rules.").

## ANALYSIS

### I.     Punishment Phase Claims

Most of the claims in McGowen's federal habeas petition relate to the punishment phase of his trial.  Specifically, claims one through nine and thirteen through fifteen all relate to McGowen's death sentence.  As indicated below, the Court finds that federal law entitles McGowen to a new sentencing hearing.

McGowen argues that the jurisprudence flowing from *Penry v. Lynaugh*, 492 U.S. 302 (1989), proves that the jury lacked an effective vehicle to give effect to his mitigating evidence. McGowen's claim invokes decades of jurisprudence involving Texas' method of placing mitigating evidence before capital juries.  In 1972, the Supreme Court in *Furman v. Georgia*, 408 U.S. 238 (1972), condemned death penalty statutes that gave a sentencer open-ended discretion.  The *Furman* Court established that a state capital sentencing system must satisfy two requirements to be constitutionally acceptable: it must "rationally narrow the class of death-eligible defendants" and "permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime."  *Kansas v. Marsh*, 548 U.S. 163, 174 (2006).

The Texas Legislature's renovation of its capital punishment scheme in the wake of *Furman* did not include a specific vehicle for the consideration of mitigating evidence.  In *Jurek v. Texas*, 428 U.S. 262 (1976), the Supreme Court upheld the constitutionality of Texas' capital sentencing statute.  The *Jurek* Court found that the constitutionality of the Texas scheme "turns on whether the enumerated [special issue] questions allow consideration of particularized mitigating factors."  *Id.* at 272.  The *Jurek* Court recognized that, while the then-existent Texas

capital sentencing statute did not directly address a defendant's mitigating evidence, the Texas Court of Criminal Appeals interpreted the statute in a way that let a jury consider mitigating circumstances. *See id.* at 272-73. By the time of McGowen's trial in 1988 the Supreme Court had firmly held that a capital sentencing statute must give effect to a defendant's mitigating evidence. *See Lockett v. Ohio*, 438 U.S. 586, 602 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 303-05 (1976).

McGowen's jury could only consider the defense's mitigating evidence through the special issue questions, which in this case asked whether (1) he acted deliberately; (2) he would be a future societal threat; and (3) he acted unreasonably in response to provocation. Before turning to the way that federal courts have responded to Texas' lack of explicit jury instructions on mitigating evidence, the Court will review the defense's punishment phase evidence and argument in this case.

A.      Punishment Phase Testimony

The prosecution presented a strong case for the death penalty. The prosecution called many witnesses to prove that McGowen would be a future threat. Testimony showed that McGowen had killed the victim deliberately and that he responded unreasonably to any provocation. The defense faced a herculean task in the punishment phase, but gave a lukewarm response. The defense called only two punishment witnesses: McGowen's sisters Rhonda T. Edwards and Valerie McGowen. McGowen's sisters provided only a superficial glimpse into his life.

From his sisters' testimony, the jury understood that McGowen came from a poor neighborhood with an unstable family life and troubled background. Ms. Edwards testified that she and McGowen lived in the same house "[a]pproximately half of [her] life" until he went to

live with his father.  Tr. Vol. 35 at 514.  After that, McGowen moved in with his grandmother.
At age sixteen he obtained his own apartment.  When Ms. Edwards was twelve or thirteen she
went to live with McGowen.  Tr. Vol. 25 a 514-15.  Many others lived in McGowen's apartment,
including his girlfriend, her two children, Norman Willis, and an uncle.  Tr. Vol. 25 at 515.

McGowen was a positive figure in his sister's life.  She testified: "[h]e was a father-like
type to me.  He told me all the right things to do, the right things to say, you know.  He showed
me how to fill out job applications when I was young."  Tr. Vol. 25 at 516.  Ms. Edwards
testified that, if McGowen received a life sentence, she would help him: "When he gets out, I
would like for him to come live with me in my home.  I would do the same things that he's
always done for me."  Tr. Vol. 25 at 518.

On cross-examination, Ms. Edwards testified that her brother had been a vocational
school while living with his grandmother before age sixteen, but he had dropped out.  Tr. Vol. 25
at 520.  The prosecution also hinted, however, that McGowen provided for his family members
by stealing, set a poor example for his siblings, and did not respond to his grandmother's efforts
to teach him "to do right."  Tr. Vol. 25 at 521.

Valerie McGowen also testified, albeit only briefly.  When she lived with McGowen, he
worked at a restaurant to provide for his girlfriend and others.  Tr. Vol. 25 at 523.  She
explained: "He worked every day.  He got up early and went to work every day."  Tr. Vol. 25 at
524.  She said she would support McGowen if he received a life sentence.  Tr. Vol. 25 at 524-25.

Contrary to her sister's testimony, Valerie McGowen explained that her brother
graduated from a vocational program.  Tr. Vol. 25 at 526-27.  She also explained that he is
articulate and intelligent.  Tr. Vol. 25 at 528.

Closing arguments drew connections between the testimony from McGowen's sisters and

the choices McGowen made.  Of particular importance to these proceedings, trial counsel's argument highlighted McGowen's disadvantaged background, both as a means for garnering sympathy and to put his actions into context.  Mr. Godwin emphasized:

> I want you to listen to what I say.  I don't mean to be misunderstood. Obviously, Mr. McGowen is black.  I don't mean to suggest and I'm not suggesting that this case was racially motivated.  There's no evidence of that.  I'm not suggesting that.  I'm not suggesting that the State prosecuted out of racial motives, *but is there any among you who can deny that growing up in Houston black, poor, uneducated, and from a broken home is a considerably different experience that what most of us are used to?  Life is solving problems.  Life is learning how to cope with problems and overcoming problems that confront us every day.  Is there any among you who think that Roger Wayne McGowen had the same chance, the same ability, had the same intelligence to overcome problems confronting him that some of us did?*

> He's sixteen or seventeen years old, and he's got an uncle.  He's got a wife.  He's got a sister.  He's being followed by the likes of no-account Norman Willis.  He's trying to hold a family together, solve their problems, help them get them down the road of life, and he has to take care of himself.  You need to consider that.  You may reject it, but please consider it.  *God didn't give all of us the same ability to solve our problems.*

> I'm not asking you to excuse any conduct.  Don't misunderstand me. What you have found him guilty of doing does not ask to be excused.  It should not be excused, but I am asking you to fairly consider all the evidence and render a decision.

Tr. Vol. 25 at 556-58 (emphasis added).  Mr. Godwin then asked the jury to "temper [the] verdict with mercy and bring out a life sentence."  Tr. Vol. 25 at 559.

Mr. Mock told the jury that McGowen would not be a future danger because the prosecution had not shown him to be a threat while incarcerated.  Tr. Vol. 25 at 572.  Then, he pleaded:

> I would ask you to look at other things like his age. . . .  You've got a guy who's twenty-three years old now.  He's young.  His career started at a very early age.  He did it the wrong way.  At sixteen after living with a series of relatives, a series of relatives, at sixteen years of age, he has his own home, his own apartment.  He has no direction, but he's got a fourteen-year-old sister to support, who was either pregnant at that time or had the baby living there with her.  He had

Norman Ray Willis.  Norman Ray Willis had nowhere else to go.  If you think Norman Ray Willis developed all these propensities for robberies, then think again.  You heard about Norman Ray Willis.  He said he went there because he had nowhere else to go, because every foster home and any other place where he had been had kicked him out.  That was at the age of thirteen to fourteen.  Talk about an incorrigible person, to be kicked out of everywhere you go before you're fourteen years old.  Everyone told him to get out.

Then you heard about some uncle who lived there off and on, an older man, but who took care of everything?  Roger McGowen.  His other sister testified that she lived with him, too.  She said he tried to help her.  He graduated from Job Corps.  He was taking care of a wife or woman and also her two children.  He is the only support.

Tr. Vol. 25 at 573-74.  Mr. Mock asked the jury to consider the "totality of the circumstances" in assessing his punishment, emphasizing his youth: "Can you imagine looking at life in the penitentiary?  My God, we haven't even begun to live at forty, and he's looking at life in the penitentiary at twenty-three years old."  Tr. Vol. 25 at 577.

The prosecution's final summation responded to the defense's arguments for leniency. The prosecutor stated:

You've got the responsibility on your shoulders.  You're not social workers.  Since when has it been an excuse because you're poor or black or whatever you want to blame it on, since when does that or society take the blame. "He never had a chance.  That's why he went and robbed somebody and killed somebody."

That's a cop-out.  I'm a minority.  Some of you are minorities.  We all make our own decisions.  We all learned that if we do something wrong. We've got to pay the price.  .  .  . Did Roger McGowen worry about those things?  He got up in the morning and went out and robbed somebody, steals, kills.  No problem.

Tr. Vol. 25 at 583-84.  The prosecutor then characterized McGowen as someone who did not learn from his background, experience, or bad choices, but one who persisted in wrongdoing.

B.     The Legal Landscape

The Court of Criminal Appeals addressed the ability of McGowen's jury to consider his mitigating evidence not long after the Supreme Court decided *Penry*.  Recent federal cases have

discussed *Penry* jurisprudence in great detail. *See, e.g., Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007); *Nelson v. Quarterman*, 472 F.3d 287 (5th Cir. 2006). This Court need not repeat the complete constitutional and legal history of the *Penry* line of cases. Nonetheless, a brief overview of the *Penry* landscape places McGowen's state and federal proceedings into a broader context.

In 1989, the Supreme Court *Penry v. Lynaugh*, 492 U.S. 302, 327-28 (1989) ("*Penry I*"), held that Texas' then-applicable procedure did not always provide an effective vehicle for considering some mitigating evidence. The Supreme Court found that some elements of the *Penry* defendant's mental retardation and child abuse evidence transcended the jury's specific inquiry under the special issues. *See id.* at 328 (quoting *Woodson*, 428 U.S. at 305)). Courts subsequently struggled with how to interpret the contours of *Penry I*. Nothing in that case signaled a wholesale rejection of Texas' special issues. The Fifth Circuit and Texas courts, therefore, grappled with deciding "by what principle should the line between *Penry I* and non-*Penry I* evidence be drawn?" *Robertson v. Cockrell*, 325 F.3d 243, 251 (5th Cir. 2003). Eventually, the *en banc* Fifth Circuit in *Graham v. Collins*, 950 F.2d 1009 (1992), outlined the principles that it would later distill into a "constitutional-relevancy test," under which it denied all *Penry* claims before 2002. *See Robertson*, 325 F.3d at 256. The Texas Court of Criminal Appeals applied a standard similar to the constitutional relevancy test in denying most *Penry* claims.

In McGowen's case, the Court of Criminal Appeals on direct review refused to extend *Penry* beyond the exact type of evidence the Supreme Court considered in that case. *See McGowen*, No. 69,855, at 26. Specifically, the Court of Criminal Appeals found that McGowen's good character evidence was not comparable to the child abuse and mental

retardation present in *Penry I.*

The flow of years has brought changes in the law, showing that the Court of Criminal Appeals' decision, while in accordance with the manner in which Texas and the Fifth Circuit had previously responded to *Penry I,* was contrary to, and an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1). The Supreme Court began reviewing Texas' response to *Penry I* in the case that resulted from Johnny Paul Penry's retrial. *Penry v. Johnson*, 532 U.S. 782 (2001) ("*Penry II*"). Supreme Court cases in the wake of *Penry II* signaled deep concerns about Texas' manner of placing mitigating evidence before juries. *See Smith v. Texas*, 543 U.S. 37, 43-45 (2004); *Tennard v. Dretke*, 542 U.S. 274, 283 (2004). Nevertheless, the Fifth Circuit issued conflicting opinions concerning the state of *Penry* jurisprudence, but generally denied habeas relief on those claims. *Compare Robertson v. Cockrell*, 279 F.3d 1062 (5th Cir. 2002), *with Tennard v. Cockrell*, 284 F.3d 591 (5th Cir. 2002), *Dinkins v. Cockrell*, 34 F. App'x 963 (5th Cir. 2002) (unpublished), *and Patrick v. Cockrell*, 34 F. App'x 150 (5th Cir. 2002) (unpublished).

In 2004, the Supreme Court rejected the Fifth Circuit's constitutional relevancy test as a "restrictive gloss on *Penry I.*" *Tennard*, 542 U.S. at 283. The *Tennard* court found that the Fifth Circuit's precedent "ha[d] no foundation in the decisions of [the Supreme] Court." *Id.* at 284. The *Tennard* court instead endorsed a two-part inquiry into whether a jury could adequately consider mitigating evidence. First, a court must decide whether the defense presented "relevant" mitigating evidence, a much lower threshold determination than the "constitutionally relevant test" hatched by the Fifth Circuit. *Id.* at 284. Second, the Supreme Court reiterated that the ultimate inquiry in a *Penry* case was whether the defendant's evidence had "mitigating dimension beyond" the special issue questions. *Tennard*, 542 U.S. at 288; *see also Smith*, 543

U.S. at 43-45 (reaching the same result in a case on certiorari review from the Texas Court of Criminal Appeals).

The Fifth Circuit gave a mixed response to *Tennard*, repeatedly distinguishing petitioners' evidence from that presented in *Penry* and *Tennard*. *See, e.g., Brewer v. Dretke*, 442 F.3d 273 (5th Cir. 2006); *Summers v. Dretke*, 431 F.3d 861 (5th Cir. 2005); *Cole (Abdul-Kabir) v. Dretke*, 418 F.3d 494 (5th Cir. 2005); *Coble v. Dretke*, 417 F.3d 508 (5th Cir. 2005).

Finally, in *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007), and *Brewer v. Quarterman*, 550 U.S. 286 (2007), the Supreme Court reaffirmed that "sentencing juries must be able to give meaningful consideration and effect to *all* mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future." *Abdul-Kabir*, 550 U.S. at 246 (emphasis added); *see also Brewer*, 550 U.S. at 294-95. "[W]hen the defendant's evidence may have meaningful relevance to the defendant's moral culpability 'beyond the scope of the special issues,'" a mitigation instruction is required. *Abdul-Kabir*, 550 U.S. at 254 n.14. Simply, "the jury must be allowed not only to consider such evidence, or to have such evidence before it, but respond to it in a reasoned, moral manner and to weigh such evidence in its calculus of deciding whether a defendant is truly deserving of death." *Brewer*, 550 U.S. at 296.

Since the *Abdul-Kabir* and *Brewer* decisions, the Fifth Circuit has described the evolved standard coming from *Penry* jurisprudence as follows: "when deciding whether to sentence a defendant to death, jurors must be able to give a reasoned moral response to evidence that has meaningful mitigating relevance beyond its ability to negate the special issues, particularly evidence which speaks to a defendant's moral culpability." *Coble v. Quarterman*, 496 F.3d 430, 447 n.15 (5th Cir. 2007). The Fifth Circuit has subsequently applied the *Abdul-Kabir/Brewer*

reading of *Penry* jurisprudence, granting relief in all but one case in which the petitioner raised a procedurally adequate *Penry* claim. *See Mines v. Quarterman*, 267 F. App'x 356, 362 (5th Cir. 2008); *Chambers v. Quarterman*, 260 F. App'x 706, 707 (5th Cir. 2007); *Garcia v. Quarterman*, 257 F. App'x 717, 723 (5th Cir. 2007); *Coble v. Quarterman*, 496 F.3d 430, 433 (5th Cir. 2007); *Nelson*, 472 F.3d at 316; *but see Smith v. Quarterman*, 515 F.3d 392, 414 (5th Cir. 2008).[8] Against that background, the Court will consider McGowen's claim that his jury could not give full effect to the mitigating evidence.

      C.      The Jury's Ability to Give a Reasoned Moral Response to McGowen's Evidence

The Court of Criminal Appeals considered McGowen's claim in a much different legal light than now shines on *Penry* claims.  The Court of Criminal Appeals, in fact, considers the jurisprudence that has developed since it considered McGowen's initial *Penry* claim to constitute "new law."  *Ex parte Hood*, 2010 WL 625052 (Tex. Crim. App. Feb. 24, 2010).  Respondent seemingly concedes that McGowen meets the low threshold of relevance for *Penry* claims. Respondent then makes a tepid effort to distinguish McGowen's evidence from those in which the Supreme Court, Fifth Circuit, and other courts have granted relief under the modern understanding of *Penry* jurisprudence.

Respondent provides three arguments to distinguish this case from the Supreme Court's modern *Penry* cases.  First, Respondent argues that the Court must deny McGowen's *Penry* claim because his evidence is categorically different from that present in *Penry*.  Respondent contrasts McGowen's mitigating evidence – which Respondent characterizes as that "he was a young, poor sociopath who chose to lead a life of crime" – with *Penry*'s evidence of mental illness and childhood abuse.  (Instrument No. 33 at 32).  The Court of Criminal Appeals likewise

---

[8]      The Fifth Circuit has refused to consider the merits of procedurally barred *Penry* claims.  *See Hughes v. Quarterman*, 530 F.3d 336, 344 (5th Cir. 2008).

viewed his evidence narrowly, though it considered his argument to be only one of good character, showing that the "was the sole means of support" and "like his father-figure" to his sisters and the others living in his apartment.  *McGowen v. State*, No. 69,855, at 26 (Tex. Crim. App. Dec. 2, 1992).

These two views do not capture the full scope of the defense's punishment phase case. True, the defense presented a superficial case for mitigation.[9]  Nonetheless, the Supreme Court has not "suggested that the question whether mitigating evidence could have been adequately considered by the jury is a matter purely of quantity, degree, or immutability." *Brewer*, 550 U.S. at 294.  The focus is on whether the evidence "dimish[ed] a defendant's moral culpability for a crime." *Id*. at 294.

However brief the defense's presentation of evidence was, Respondent and the Court of Criminal Appeals have construed the defense's case for mitigation too narrowly.  The mitigating thrust of McGowen's evidence was not that he was a "young, poor sociopath" with a "good character."  The defense's case for mitigation, particularly as clarified through trial counsel's closing argument, was threefold: (1) youthful McGowen came from a disadvantaged background; (2) his background limited his ability to solve problems in his life; and (3) he nonetheless had redeeming qualities, such as assuming responsibility for his two younger sisters. With the possible exception of good character evidence,[10] recent cases do not categorically foreclose *Penry* relief on McGowen's mitigation evidence.  For example, the Supreme Court in *Brewer* criticized the argument that "evidence of a troubled childhood may . . .  fall sufficiently

---

[9]      McGowen claims that trial counsel failed to develop and present significant mitigating evidence.  This Court's focus in *Penry* claims is on the information that was before the jury, not what trial counsel should have presented.  *See Boyd v. Johnson*, 167 F.3d 907, 912 (5th Cir. 1999) ("A petitioner cannot base a *Penry* claim on evidence that could have been but was not proffered at trial.").

[10]      Insofar as McGowen's evidence was of good character alone, the special issues sufficiently allowed the jury to take that into consideration.  *See Franklin v. Lynaugh*, 487 U.S. 164, 177-78 (1988); *Garcia v. Quarterman*, 257 F. App'x 717 (5th Cir. 2007) (unpublished); *accord Graham v. Collins*, 506 U.S. 461, 466 (1993).

within the ambit of the special issues." *Brewer*, 550 U.S. at 296 (quotation omitted).  The distinction propounded by the Court of Criminal Appeals and Respondent, therefore, must give way to a review of whether McGowen's evidence "ha[d] mitigating relevance to the special issues" and "the extent to which it . . . diminish[ed] his moral culpability for the crime." *Brewer*, 550 U.S. at 294. The key question is whether that evidence "has meaningful mitigating relevance beyond its ability to negate the special issues, particularly evidence which speaks to a defendant's moral culpability." *Coble*, 496 F.3d at 447 n.15.

As the second argument, Respondent distinguishes *Abdul-Kabir* and *Brewer* because, unlike in those cases, no "overly aggressive prosecutorial arguments" limited the jury's discretion in answering the special issues.  (Instrument No. 33 at 33).  In *Abdul-Kabir*, the prosecution reminded the jurors of their promise during voir dire to answer the special issues on the facts alone, not on mitigating factors.  *Abdul-Kabir*, 550 U.S. at 241-42.  In *Brewer,* the prosecution de-emphasized the defense's mitigating evidence and told the jurors that they could not say whether the defendant "lives or dies," but only answer the special issues.  *Brewer*, 550 U.S. at 241-42.

The prosecutor in this case made some statements similar to those in *Brewer*, such as limiting the jury's awareness that their decision would result in life or death.  The prosecution's argument also limited the jury's consideration of the deliberateness special issue to two factors: (1) had McGowen lived a life that predisposed him to kill and (2) did he choose to pull the trigger?  The prosecution, in essence, narrowed the jury's evaluation to the decisions McGowen made, without regard for the reasons he made decisions in that manner.  However, the tone and tenor of the discussion did not attempt to short-circuit the mitigating defense completely.  While the prosecutor told the jury that the defense's arguments had no merit, he did not tell them to

disregard mitigation completely. Nonetheless, the question in *Abdul-Kabir* and *Brewer* did not turn on the prosecutor's language, but on whether the special issues allowed the jury to give meaningful effect to the defense's evidence. Any prosecutorial restraint in not encouraging the jury to ignore mitigation only matters if the jury could otherwise give a reasoned moral response through the statutory special issues.

Respondent's third argument is that the jury could make a moral response to the evidence because McGowen only sought to "humanize himself before the jury," not "diminish his moral culpability." (Instrument No. 33 at 34-35). As evinced by counsel's summation, the mitigation case did not just go to sympathy; it advocated that McGowen's background explained the choices he made. Trial counsel portrayed his client as less morally culpable because the formative circumstances of his life made him less morally capable. *Abdul-Kabir* and *Brewer* held that a jury must be able to respond to that type of evidence.

Respondent in passing cites *Smith v. Quarterman*, 515 F.3d 392 (5th Cir. 2008), the only Fifth Circuit case to deny a *Penry* claim since the issue last came before the Supreme Court. Respondent relies on *Smith* for the proposition that "the Fifth Circuit Court has held that the resolution of a *Penry* claim requires an examination of the extent to which a petitioner's evidence diminishes his culpability for the crime." (Instrument No. 33 at 31). True, the Fifth Circuit in *Smith* held that a valid *Penry* claim must link a defendant's mitigating evidence and his moral culpability. In essence, the *Smith* Court denied habeas relief because the petitioner drew no connection between his troubled childhood and his character:

> The emphasis of the *Penry* cases is on childhood adversity which has a formative, adverse effect on the defendant's character, thereby potentially reducing his moral culpability. . . . None of Smith's witnesses claim any such effect; indeed, to the limited extent that they mentioned his character, Smith's mother and sister described him in positive terms, as calm and respectful, and, to their knowledge, non-violent and not a drug-user. This is a case where the petitioner's evidence

"has only a tenuous connection . . . to the [petitioner's] moral culpability."

*Smith*, 515 F.3d at 414 (quoting A*bdul-Kabir,* 550 U.S. at 253 n.14).  The *Smith* Court, however, limited its holding to those cases in which the defense does not link a defendant's deprived background to his depraved choices:

> We emphasize that our holding here is a narrow one, based on our detailed review of the record which contains no evidence of a connection between the poverty and crime of the Fifth Ward and Smith's character.  Unless we are to assume that every individual who grew up in poverty and in a crime-infested neighborhood has, by that fact alone, potentially reduced moral culpability, requiring a *Penry* instruction, we cannot conclude that the TCCA erred when it decided that Smith's sentence passed muster under *Penry.*

*Id.* at 414 .

Unlike in *Smith*, however, McGowen's trial counsel drew a connection between his disadvantaged background and his character.  Trial counsel did not just hope that the jury would show McGowen mercy because of his troubled childhood and background; trial counsel's argument connected his poor life choices to his poor background.  Specifically, counsel begged:

> [I]s there any among you who can deny that growing up in Houston black, poor, uneducated, and from a broken home is a considerably different experience that what most of us are used to?  Life is solving problems.  Life is learning how to cope with problems and overcoming problems that confront us every day.  Is there any among you who think that Roger Wayne McGowen had the same chance, the same ability, had the same intelligence to overcome problems confronting him that some of us did?

Tr. Vol. 35 at 557.  While not as articulately as possible, trial counsel linked McGowen's background to his tendency to solve problems by resorting to crime and violence.  In contrast to *Smith*, trial counsel drew a connection between what McGowen had experienced and what he had become.

Respondent's arguments do not show that the jury could adequately consider McGowen's moral culpability.  The special issues did not allow the jury "to respond to [McGowen's

evidence] in a reasoned, moral manner and to weigh such evidence in its calculus of deciding whether a defendant is truly deserving of death" without additional instruction. *Brewer*, 550 U.S. at 296. While McGowen's "mitigating evidence may not have been as persuasive as Penry's, it was relevant to the question of [his] moral culpability . . . [because it] did not rebut either deliberateness or future dangerousness but was intended to provide the jury with an entirely different reason for not imposing a death sentence." *Abdul-Kabir*, 550 U.S. at 259; *see also Graham*, 506 U.S., at 475 (acknowledging that a "constitutional defect" has occurred not only when a jury is "precluded from even considering certain types of mitigating evidence," but also when "the defendant's evidence [i]s placed before the sentencer but the sentencer ha[s] no reliable means of giving mitigating effect to that evidence").

Simply, this is a case where "a properly instructed jury could have concluded that [McGowen] was less morally culpable for his crime because of his disadvantaged upbringing and would have had no means, under the deliberateness and future dangerousness instructions, of giving the evidence such effect." *Chambers*, 260 F. App'x at 707. On the one hand, the future dangerousness allowed the jury to conclude that his disadvantaged background, troubled childhood, and immature choices made him more likely to engage in future violence. Nonetheless, the jury also could have reasoned that those factors made him less morally culpable and, thus, less deserving of a death sentence. The future dangerousness issue, however, would not have allowed the jury to reach that conclusion. *See Nelson*, 472 F.3d at 312 ("If the jury concluded that Nelson was likely to be dangerous in the future based on his mental disorder and abusive childhood, but also concluded that this evidence rendered him less morally culpable, it had no way to give effect to the mitigating aspect of that evidence through the two special issues."). The provocation and deliberateness issues forced the jury to respond to McGowen's

bad choices without allowing them to review why he made bad choices. Thus, the special issues provided no vehicle for the jury to consider adequately the major mitigating thrust of McGowen's punishment phase case. McGowen has shown constitutional error in his jury instructions.

D.      Harmlessness of the Constitutional Error

Respondent argues that, even if the jury could not consider McGowen's mitigation evidence, any resultant error would be harmless. On the facts of this case, Respondent makes a compelling argument. The prosecution called witness after witness in the punishment phase to show that McGowen was extremely violent, deliberate, and uncaring. McGowen threw himself in a life of lawlessness and violence, showing no remorse or hope for rehabilitation. The mitigating evidence presented by the defense was meager, at best, in comparison. Even assuming that jurors could fully appreciate his mitigating evidence, the defense gave the jury little reason not to answer the special issues in a manner requiring a death sentence. McGowen almost certainly would have received a death sentence even if the trial court had anticipated the *Penry* decision, and all the subsequent jurisprudence, and correctly instructed the jury.

But the law as it currently stands does not allow for a harmless-error review of *Penry* claims. "[T]he question whether some types of *Penry* error might be subject to harmless error review has not been squarely decided by and remains unresolved by the United States Supreme Court." *Garcia*, 257 F. App'x at 724; *see also Smith*, 550 U.S. at 316 (Souter, J., concurring) ("In some later case, we may be required to consider whether harmless error review is ever appropriate in a case with error as described in *Penry*[.] We do not and need not address that question here."). The Fifth Circuit, however, has noted that "the Supreme Court has *never* applied a harmless-error analysis to a *Penry* claim or given any indication that harmless error

might apply in its long line of post-*Furman* cases addressing the jury's ability to give full effect to a capital defendant's mitigating evidence." *Nelson*, 472 F.3d at 314.  The Fifth Circuit has held that "it would be wholly inappropriate for an appellate court, in effect, to substitute its own moral judgment for the jury's in these cases." *Id.* at 315.  Given that reasoning, Fifth Circuit precedent "forecloses any argument that a *Penry* error can be subject to harmless error review." *Mines*, 267 F. App'x at 362 n.3; *see also Nelson*, 472 F.3d at 314-15.

Respondent has not shown any legal authority that would allow this Court to distinguish or disregard the Fifth Circuit cases holding that *Penry* error cannot be harmless.  This Court must follow Fifth Circuit law and assume that the *Penry* error affected the jury's sentencing decision.  Accordingly, more than two decades after the first trial, Texas must either hold a new punishment hearing or commute McGowen's sentence to life imprisonment.

> E.      Conclusion of Punishment Phase Claims

Habeas relief on McGowen's *Penry* claim renders moot the other claims that attack his punishment phase.  In the interests of judicial economy, the Court will not address their merits.[11] The Court, therefore, will only adjudicate the claims that challenge his capital conviction.

## II.     Procedural Adequacy of McGowen's Remaining Claims

McGowen raises four claims that relate to the trial of his guilt.  Specifically, the following claims ask the Court to review McGowen's conviction: (1) trial counsel provided ineffective assistance by not investigating McGowen's innocence (claim ten)[12]; (2) McGowen is

---

[11]      Of the remaining punishment phase claims, most suffer from procedural defects because McGowen either did not present them in state court or did so in a procedurally inappropriate manner.  He has not shown that the Court could reach their merits.  Only claims four, five and six would otherwise come before the Court without procedural impediments.  The Court has reviewed their merits and, *arguendo*, finds no merit to them.  The Court would deny McGowen's procedurally sound punishment-phase claims even if his *Penry* claim did not render them moot.

[12]      Claim ten also faults trial counsel for not uncovering significant evidence for presentation as mitigating factors.  The grant of relief on McGowen's *Penry* claim renders that portion of claim ten moot.

actually innocent (claim eleven); and (3) the State failed to turn over *Brady* evidence (claim twelve). McGowen also raises a claim of cumulative error (claim sixteen), which is dependent on finding error in his other claims.

McGowen has not placed any of those remaining claims before the Court in a procedurally adequate manner. McGowen presented part of claim ten in his untimely amended habeas application, though he also amplified the factual basis for that claim in his successive habeas application. The Court of Criminal Appeals found that McGowen abused the habeas writ by bringing claims eleven and twelve in a successive habeas proceeding. McGowen has never presented his sixteenth claim to the state courts. Respondent argues that this Court cannot reach the merits of those claims.

The exhaustion and procedural default doctrines, both of which embody federal acquiescence to principles of comity and federalism, restrict consideration of habeas claims. Federal courts have long required inmates to give state courts the first chance to rectify constitutional violations. *See Ex parte Royall*, 117 U.S. 241, 251-52 (1886). To avoid the "'unseem[liness]' of a federal district court's overturning a state court conviction without the state courts having had an opportunity to correct the constitutional violation in the first instance," *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999), the AEDPA requires an inmate to raise his federal habeas claims in the highest state court before federal habeas relief becomes available. *See* 28 U.S.C. 2254(b)(2); *Fisher v. Texas*, 169 F.3d 295, 302 (5th Cir. 1999); *Burns v. Estelle*, 695 F.2d 847, 849 (5th Cir. 1983). Absent compliance with the exhaustion doctrine, the AEDPA only gives a federal court authority to deny a habeas claim. *See* 28 U.S.C. § 2254(b)(2).

The procedural default doctrine similarly constricts the scope of federal habeas review for claims that an inmate has not exhausted properly. As "[a] corollary to the habeas statute's

exhaustion requirement, . . . federal courts will not disturb state court judgments based on adequate and independent state law procedural grounds." *Haley*, 541 U.S. at 392-93; *see also Coleman*, 501 U.S. at 729 (stating that federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment").   Under the procedural bar doctrine, "a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." *Coleman*, 501 U.S. at 732.   In such cases, consideration of a federal issue gives way to state procedural law. *See Lambrix*, 520 U.S. at 523; *Coleman*, 501 U.S. at 731.   Respondent argues that McGowen presented claims ten through twelve in a way that did not fully comply with state procedure.   Because the Court of Criminal Appeals would apply procedural law to prevent McGowen from litigating claim 16, its unexhausted nature also results in a procedural bar. *See Coleman*, 501 U.S. at 735 n.1; *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997).

A state procedural default is not an insurmountable barrier to federal review.   An inmate may challenge the independence and adequacy of a state procedural rule.   Also, the Supreme Court has noted that

> [i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate *cause* for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman*, 501 U.S. at 750 (emphasis added).

McGowen makes three primary arguments to overcome the procedural bar of his claims. McGowen first claims that Texas did not rely on an adequate and independent state procedural

bar to prevent state review.  Next, McGowen claims that he can show cause and prejudice because his initial state habeas attorney should have included the barred claims in his first habeas application.  Third, McGowen claims that his actual innocence allows federal review.[13]  None of these arguments allows the Court to reach the merits of his barred claims.

       A.      Adequate and Independent Law

The Court of Criminal Appeals denied McGowen's tenth claim in his first amended state habeas application.  There, the Court of Criminal Appeals *sua sponte* found that his amendment was untimely.  *See* TEX. CODE CRIM. PRO. art. 11.071 § 5(f) ("If an amended or supplemental application is not filed within the time specified under Section 4(a) or (b), the court shall treat the application as a subsequent application under this section.").  The Court of Criminal Appeals found that he had not met any of the exceptions in TEX. CODE CRIM. PRO. art. 11.071 § 5(a).  Specifically, section 5(a) requires a Texas court to dismiss any successive application unless an inmate meets one of three exceptions:

> (1)    the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;
>
> (2)    by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or
>
> (3)    by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial[.]

TEX. CODE CRIM. PRO. art. 11.071 § 5(a).  The Court of Criminal Appeals also applied art. 11.071 § 5 when McGowen filed claims eleven and twelve in a successive habeas proceeding.

---

[13]    With respect to his *Brady* claim, McGowen claims he can overcome the procedural bar by showing that the police kept information from him.  The Court will consider that argument in conjunction with the alternative review of that claim.

Although McGowen has never presented his sixteenth claim to the state courts, the Court assumes that TEX. CODE CRIM. PRO. art. 11.071 § 5 would prevent him from doing so if he tried.

The Fifth Circuit has routinely and regularly found that TEX. CODE CRIM. PRO. art. 11.071 § 5(a) – the codification of Texas' abuse-of-the-writ doctrine – serves as an independent and adequate ground to bar federal review. *See Barrientes*, 221 F.3d at 759; *Fuller v. Johnson*, 158 F.3d 903, 906 (5th Cir. 1998); *Emery v. Johnson*, 139 F.3d 191, 195-96 (5th Cir. 1997); *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995). McGowen, however, makes two arguments against its application here. First, McGowen argues that Texas' abuse-of-the-writ inquiry is not a mere procedural finding, but also incorporates "a merits determination on the federal claim in order to determine whether the procedural bar applies. This effectively renders the state rule dependant, rather than independent." (Instrument No. 38 at 12). Thus, under his reasoning, the procedural determination is not sufficiently independent of a merits adjudication, which involves federal law, to foreclose federal review. Second, McGowen complains that the brevity of the state court order makes it unclear whether the Court of Criminal Appeals rejected his claim on procedural grounds.

Comity and federalism mandate that federal courts give proper respect to state procedural rules, insofar as the "rule is independent and adequate to support the judgment." *Sayre v. Anderson*, 238 F.3d 631, 634 (5th Cir. 2001). While federal courts "have an independent duty to scrutinize the application of state rules that bar our review of federal claims," *Cone v. Bell*, ___ U.S. ___, 129 S. Ct. 1769, 1782 (2009), "[t]he petitioner bears the burden of showing that the state did not strictly or regularly follow a procedural bar around the time of his [state court action]." *Stokes v. Anderson*, 123 F.3d 858, 860 (5th Cir. 1997) (citing *Sones v. Hargett*, 61 F.3d 410, 416 (5th Cir. 1995)).

The "independent" and "adequate" inquiries examine separate components of the state procedural ruling.  A state procedural rule is not independent when the relevant decision "'fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion.'"  *Coleman*, 501 U.S. at 735 (quoting *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983)).  A rule qualifies as adequate when it "is strictly or regularly followed by the cognizant state court" and "applied evenhandedly to the vast majority of similar claims."  *Amos v. Scott*, 61 F.3d 333, 339 (5th Cir. 1995).

McGowen's argument relies heavily on *Ex parte Campbell*, 226 S.W.3d 418, 421 (Tex. Crim. App. 2007), a case in which he alleges that the Court of Criminal Appeals inserted a merits review into its art. 11.071 § 5(a) inquiry.  In *Campell*, the Court of Criminal Appeals addressed the implementation of the statutory standards for successive petitions:

> To satisfy section 5(a)(1), a subsequent application must contain sufficient specific facts establishing that "the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application."  We have interpreted this to mean that, to satisfy Art. 11.071, § 5(a), 1) the factual or legal basis for an applicant's current claims must have been unavailable as to all of his previous applications; and 2) the specific facts alleged, if established, would constitute a constitutional violation that would likely require relief from either the conviction or sentence.

*Campbell*, 226 S.W.3d at 421.  McGowen latches onto the phrase, "specific facts alleged, if established, would constitute a constitutional violation that would likely require relief from either the conviction or sentence," to argue that the Texas courts now universally engage in a merits review when dismissing successive petitions.  McGowen also cites *Ruiz v. Quarterman*, 504 F.3d 523, 527 (5th Cir. 2007), a case relying on *Campbell* in which the Fifth Circuit refused to find

that a state procedural bar foreclosed federal review.[14]

The circumstances of this case do not suggest that the Court of Criminal Appeals adjudicated the merits of his claims.  The state court order differed greatly from that in *Ruiz*.  In *Ruiz*, the state court adjudication was uncertain because of the disjointed and discrete decision rendered by the Court of Criminal Appeals.  The Fifth Circuit laboriously examined the opinions of individual judges on the Court of Criminal Appeals to conclude that the state court applied federal law.  In essence, the determinative vote cast in *Ruiz* explicitly rested on a merits review.

Here, nothing in the record suggests that the Court of Criminal Appeals adjudicated the merits of McGowen's procedurally barred claims.[15]  The Court of Criminal Appeals' brief order specifically invoked Texas' abuse-of-the-writ statute.  Subsequent Fifth Circuit cases show that *Ruiz* should not be read so broadly as always to prevent art. 11.071 § 5 from acting as an independent and adequate procedural bar.[16]

The Fifth Circuit since *Ruiz* has applied Texas' abuse-of-the-writ doctrine in circumstances similar to this case.  *See Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008).  In *Hughes*, the Fifth Circuit identified two factors that discourage reading any uncertainty into the Court of Criminal Appeals' terse order.  First, the factual basis for McGowen's barred claims were obviously available well before he filed his barred claims.  *See Hughes*, 530 F.3d at

[14]     At least one circuit distinguishes between a state court's consideration of federal law in applying a state procedural rule and doing so in applying an exception to that rule.  *See Gardner v. Galetka*, 568 F.3d 862, 884 (10th Cir. 2009).

[15]     A circular argument may exist that, by reviewing an inmate's actual innocence under section 5(a)(3), the state court has considered the merits of his federal claim, thus preventing any procedural bar from thwarting federal review.  Such an argument, however, is unavailing because federal precedent has held that actual-innocence claims are not a cognizable ground for federal habeas relief.

[16]     McGowen also relies on *Ex parte Blue*, 230 S.W.3d 151 (Tex. Crim. App. 2007), a case in which the Court of Criminal Appeals considered whether an inmate's mental retardation would constitute actual innocence under 5(a)(3), thus allowing a claim brought under *Atkins v. Virginia*, 536 U.S. 304 (2002), to proceed.  To the extent that *Blue* implies that 5(a)(3) intertwines federal law in the consideration of successive *Atkins* claims, no such issue is before the Court.  This Court's concern is whether the Texas state courts have independently applied federal law to "similar claims."  *Amos*, 61 F.3d at 339.

342 ("No application or interpretation of federal law is required to determine whether a claim has, or could have, been presented in a previous habeas application."). Second, "there is nothing in its perfunctory dismissal of the claims that suggests that [the Court of Criminal Appeals] actually considered or ruled on the merits." *Id.* at 342. As in *Hughes*, the state court's order would not depend on resolution of McGowen's claims. *See Stewart v. Smith*, 536 U.S. 856, 861 (2002) (looking at whether the state procedural rule "require[d] an examination of the merits"). A valid state procedural bar forecloses federal review.

      B.     Cause and Prejudice

McGowen suggests that the ineffective assistance of his initial state habeas counsel should forgive the procedural bar. As an initial matter, this Court notes that a petitioner must exhaust his allegations that serve as "cause" for a procedural default. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) ("[A]n ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted[.]"). McGowen has not attempted to litigate in state court those arguments he now advances for "cause." McGowen's arguments to overcome the procedural impediments, therefore, are similarly procedurally barred.

Nonetheless, the Fifth Circuit has repeatedly held that "alleged infirmities in state habeas proceedings are not grounds for federal habeas relief." *Brown v. Dretke*, 419 F.3d 365, 378 (5th Cir. 2005); *see also Elizalde v. Dretke*, 362 F.3d 323, 331 (5th Cir. 2004); *Beazley v. Johnson*, 242 F.3d 248, 271 (5th Cir. 2001); *Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999); *Duff-Smith v. Collins*, 973 F.2d 1175, 1182 (5th Cir. 1992). Under that reasoning, "'ineffective assistance of habeas counsel cannot provide cause for a procedural default.'" *Henderson v. Cockrell*, 333 F.3d 592, 606 (5th Cir. 2003) (quoting *Martinez v. Johnson*, 255 F.3d 229, 241 (5th Cir. 2001)); *see also Ruiz v. Quarterman*, 460 F.3d 638, 644 (5th Cir. 2006). McGowen has

not shown cause to forgive the procedural default of his claim.

        C.      Fundamental Miscarriage of Justice

McGowen most strongly argues that he can show a fundamental miscarriage of justice based on *Schlup v. Delo*, 513 U.S. 298 (1995). "The fundamental miscarriage of justice exception to the rule that state procedural default bars federal habeas review is limited to cases where the petitioner can make a persuasive showing that he is actually innocent of the charges against him." *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001); *see also Henderson*, 333 F.3d at 605.

The Supreme Court has "often emphasized 'the narrow scope' of the [actual innocence] exception." *Calderon*, 523 U.S. at 559 (quoting *Sawyer v. Whitley*, 505 U.S. 333, 340 (1992)). "Given the rarity of such evidence, in virtually every case, the allegation of actual innocence has been summarily rejected." *Calderon*, 523 U.S. at 560 (quotation omitted); *see also Schlup*, 513 U.S. at 324 ("[C]laims of actual innocence are rarely successful."). In part, this is because a reviewing court does not look at the new evidence in isolation, but makes "a holistic judgment about 'all the evidence'" including "how reasonable jurors would react to the overall, newly supplemented record." *House*, 547 U.S. at 539 (quoting *Schlup*, 513 U.S. at 328)).

A two-part inquiry explores whether an inmate has shown a fundamental miscarriage of justice. An inmate must first question the integrity of his trial proceedings by producing *"new reliable evidence* – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – *that was not presented at trial*." *Schlup*, 513 U.S. at 324 (emphasis added); *see also Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999) ("Examples of new, reliable evidence that may establish factual innocence include exculpatory scientific evidence, credible declarations of guilt by another, trustworthy eyewitness accounts, and certain

physical evidence."). Next, an inmate "must show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327; *House*, 547 U.S. at 538 (stating that a petitioner must show "that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt – or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt"). With the "extremely rare" success of actual innocence arguments in mind, *Schlup*, 513 U.S. at 324, the Court considers whether McGowen has brought forth new, reliable evidence which could cause a reasonable juror not to convict.[17]

Because McGowen's fundamental miscarriage of justice argument impacts any alterative consideration of the merits, the Court will address McGowen's allegations of innocence at length. McGowen's arguments on federal review have evolved from those he initially presented in state court. McGowen downplays his original complaint that trial counsel provided ineffective assistance by not crafting an alibi defense. Now, McGowen claims that he is actually innocent because his brother Charles McGowen committed the murder.

### 1. Information from McGowen's first state habeas action

When McGowen filed his first state habeas action, he did not raise the same complex

---

[17]    Courts are not uniform in defining the modifier "new" in this context. Some courts only recognize evidence as "new" if it relies on a factual predicate that arose well after trial. *See Osborne v. Purkett*, 411 F.3d 911, 920 (8th Cir. 2005) ("Evidence is only new if it was not available at trial and could not have been discovered earlier through the exercise of due diligence.") (quotation omitted). Other courts treat evidence as "new" if it was available, but not presented, at trial. *See Gomez v. Jaimet*, 350 F.3d 673, 679 (7th Cir. 2003) ("All *Schlup* requires is that the new evidence is reliable and that it was not presented at trial."); *Griffin v. Johnson*, 350 F.3d 956, 963 (9th Cir. 2003) (requiring "newly presented," not newly available evidence). The question, in essence, is "whether *Schlup* requires 'newly discovered' evidence or merely 'newly presented' evidence." *Wright v. Quarterman*, 470 F.3d 581, 591 (5th Cir. 2006). The Supreme Court and the Fifth Circuit have not yet conclusively spoken on that debate. *See id.; cf. United States v. Davies*, 394 F.3d 182, 191 n.8 (3rd Cir. 2005) (refusing to "weigh in today on the 'newly presented' versus 'newly discovered' issue[]"). The Fifth Circuit, however, has found that evidence will not meet the *Schlup*'s "new" standard if "it was always within the reach of [the inmate's] personal knowledge or reasonable investigation." *Moore v. Quarterman*, 534 F.3d 454, 465 (5th Cir. 2008). Under the Fifth Circuit's definition in *Moore*, an inmate cannot succeed on an actual-innocence claim and an ineffective-assistance-of-counsel claim which rest on the same set of facts. If trial counsel should have presented certain information before the jury, then the information "was always within the reach of [the inmate's] personal knowledge or reasonable investigation" *Moore*, 534 F.3d at 465.

actual innocence claim that he champions in his federal habeas petition.   In state court, McGowen claimed that trial counsel should have raised an alibi defense based on three theories: (1) he was attending a family birthday party at the time of the murder; (2) individuals had heard that his brother Charles McGowen had committed the crime; and (3) a family friend heard that someone named "Kirkwood" – identified as Kindle – had committed the crime.   On that basis, McGowen claimed that trial counsel should have focused on challenging his identity as the killer.

One persistent problem McGowen has faced has been supporting his claims with admissible evidence.   In the amendment to his initial state habeas application, McGowen filed several affidavits to support the proposed alibi defense, though most only related hearsay. McGowen's older sister Rose Ayers provided the only affidavit that related personal knowledge about McGowen's alleged whereabouts at the time of the murder.[18]   In her affidavit Ms. Ayers claims that she could have provided McGowen with an alibi.   The day of the murder – March 11, 1986 – was her birthday.   She would have testified that McGowen had attended a birthday party for her: "On this day Roger was at my house with several other people, including Deborah Ann McGowen, Cheryl Lynn McGowen, Uncle Henry Lee and myself.   We cooked a big meal and celebrated my birthday."   State Habeas Record at 135.

The remaining affidavits from the first state habeas proceeding mostly related hearsay about the killer's identity.   McGowen's older sister Valerie Foote's affidavit provided significant details about the deprived background in which they grew up.   In that long account, she made a

---

[18]     Ms. Ayers complained that no one from the defense contacted her during trial.   In fact, one day she aggressively approached Mr. Mock, who said that he would speak with her later.   The defense team never asked her for information.   Ms. Ayer's affidavit does not accuse anyone of having killed Ms. Pantzer.   Ms. Ayer, however, disparaged her cousin Kerwin Kindle.   She said that he "was always trying to make a fast buck" and "often used Roger's car without Roger's permission," apparently insinuating that Kindle was involved in the murder.   State Habeas Record at 135.

single statement about the killer's identity: "I have heard that [her brother] Charles [McGowen] committed this crime and not Roger, but I don't know.  I can only tell you that Roger did not seem the type, and Charles was a robber, not Roger."

An inmate, Joe E. Williams provided an affidavit, which supported Ms. Foote's statement that Charles McGowen committed the murder.  Williams claims that he saw Charles McGowen on the night of the murder.  McGowen "had been shot in the thigh."  Williams states: "Charles told me that night that he had tried to rob a place and got in a shoot out.  The next day I recall seeing the news telling about the woman that got killed in Montrose in a robbery.  That was the shoot out Charles was telling me about."  State Habeas Record at 114. [19]

Martha Jackson, whose daughter dated McGowen for several years, provided a hearsay account that conversely claims that Kindle was the killer:

> I have met Kirkwood a few times.  There was something about him I did not trust.  He had that look in his eye that was not trust worthy.  Kirkwood was known to lie to the police and tell them other people did crimes when in fact he was the one who did the crime.  He is a known robber.  I have been told Kirkwood steals from his own relatives.

> I was playing cards one night with some of my relatives. Linda Faye Allen and I started talking about Roger Wayne McGowen being locked up for murder.  Linda Faye Allen told me that Roger did not do the murder.  That in fact Kirkwood ran from the police after Roger was arrested and went to her house and hid out for a few weeks.  Kirkwood bragged to her about the murder.  He also told Linda that his cousin Roger was too much a coward to shoot anyone.

State Habeas Record at 139.  In his state habeas application, McGowen assumes that "Kirkwood" refers to his cousin Kindle, the man he accused in his confession of helping him rob the bar.  State Habeas Record at 55.[20]  Ms. Ayers' affidavit also implied that Kindle was the killer.

---

[19]    An affidavit from investigator Gerald Bierbaum explains: "I learned of Joe Williams because he wrote Roger McGowen an unsolicited letter concerning the facts in his statement."

[20]    McGowen he does not provide an affidavit from Linda Faye Allen.

McGowen also relied on hearsay statements from his investigators, Gerald Bierbaum and Lisa Milstein.[21]  Mr. Bierbaum described how he uncovered the various statements providing information about the murder and reiterated their contents.  State Habeas Record at 128.  He also provided an autopsy report for Charles McGowen, who had died in a shoot out with police after McGowen's trial. The autopsy examination of Charles McGowen explains: "In the middle thigh anteromedially was a round ½ inch in diameter scar."  State Habeas Record at 119.  The autopsy does not suggest that Charles McGowen suffered a through-and-through wound, an important fact because Kindle pointed out to the police the slug that Ms. Pantzer fired at the assailant.

In her statement, Ms. Milstein claims that McGowen's sisters Rose Ayers, Deborah McGowen, and Cheryl McGowen could have testified at trial that McGowen was at a birthday dinner on the night of the murder.  She relates a statement by Ms. Ayers that implicates Kindle in the crime.  Ms. Milstein also claims to have interviewed Linda Faye Allen (the woman from whom Martha Jackson's affidavit derives), but "she indicated to [her] that her excessive drug use has affected her memory to the extent that she is unable to remember many things from her life. However, she stated that, if Martha Jackson remembers her making any such statements about Kerwin Kindle, she probably made the statements."  Ms Milstein's statement, however, provided nothing but hearsay recitations.  State Habeas Record at 131-33.

Based on those affidavits, McGowen claimed that trial counsel should have investigated ways to dispute his guilt.  In state court, he argued:

> Had counsel attempted an investigation he would have discovered evidence that [McGowen] was possibly with family at the time of the murder and could not have been at the bar[.] . . .  Moreover, counsel would have learned of two other

---

[21]     In his successive state habeas action, McGowen called Ms. Milstein's credibility into question: "information on that investigator, Lisa Milstein, has began to come out showing that she engaged in unethical conduct, has lost her investigative licence, and was probably under the influence of a drug addiction at the time she investigated the case for Mr. McGowen.  (This is discussed more fully below)."  Successive State Habeas at 4. McGowen did not elaborate on these allegations, nor does he renew them in federal court.

possible suspects in the murder.  Kerwin Kindle admitted to Linda Faye Allen he committed the murder.  And Joe Williams had information that [McGowen's] brother was shot at around the time of this murder; was shot during a failed robbery attempt; and, was shot in the Montrose area.

State Habeas Record at 56.  Thus, "there is evidence that two other persons present in the same general area, who claimed participation in the robbery and murder."  State Habeas Record at 61.

The state habeas court ordered McGowen's trial attorneys to respond to his accusations. State Habeas Record at 154-56.  The resultant affidavits stoutly denied having inadequately investigated defensive strategies, but also explained that the attorneys felt limited by McGowen's confession.  Mr. Godwin explained that he "did not speak with any of the alleged alibi witnesses discussed in [McGowen's] writ."   He assumed that Mr. Mock and their investigator were performing that investigation.  Nevertheless, he found no reason to doubt McGowen's police statement: "I also assumed that [McGowen's] confession was basically true.  [McGowen] never contradicted the fact that he was at the complainant's bar during the shooting.  I was not made aware of any alibi witnesses to the case-in-chief.  [McGowen] never denied the allegation that he shot the complainant, and he never furnished me with alibi witnesses."  State Habeas Record at 166.  Mr. Mock provided even a stronger statement:

We talked with [McGowen] himself many times, and either myself or our investigator interviewed possible witnesses who arose during such discussions with [him].  . . . I am aware of the allegations made in the writ application that [McGowen's] family members, specifically Rose Ayers, Deborah McGowen, and Cheryl McGowen, attempted to contact me with regard to an alibi defense.  These allegations are false.  No one ever told me that [McGowen] was at a birthday party during the complainant's murder, nor did anyone give me any other evidence which could have supported an alibi defense.  In fact, in light of the confession, my discussions with [McGowen], and my investigation of the case, I could not have presented an alibi defense without suborning perjury.

State Habeas Record at 170.

The lower state habeas court rejected McGowen's ineffective-assistance claim on the

merits,[22] but the Court of Criminal Appeals rejected those findings because it dismissed his case as an abuse of the writ.

2.   Allegations raised on successive state and federal review

McGowen has presented several new affidavits in his federal habeas petition.  The Court abated the proceedings so that Texas could have the first opportunity to address McGowen's unexhausted arguments.  When McGowen tried to raise his claims in a successive state habeas application, the Texas state courts dismissed his action as an abuse of the writ.

Of all the affidavits he has amassed for federal review, McGowen places the greatest emphasis on a statement prepared by Kerwin Kindle.[23]  When Kindle signed his statement in 2007, he was serving a federal prison sentence for trafficking cocaine.  *United States of America v. Kindle*, 1:03CR00199-002 (E.D. Tex.).  Kindle has gone from being a suspect in this case to being McGowen's star witness.  Kindle, long known to be McGowen's partner in this crime,

---

[22]        The lower state habeas court found "incredible [McGowen's] alibi assertion, made for the first time on habeas, in light of [his] statement, the evidence presented at trial, and the credible affidavits of trial counsel."  State Habeas Record at 395.  The state habeas court's findings placed great emphasis on McGowen's confession, which is to be expected as he gave the habeas court no sound reason to doubt its integrity.  The state habeas court found that McGowen "admitted in his written statement that he went to the complainant's bar intending to commit a robbery and fired his gun."  State Habeas Record at 393-94.  To that end, the state habeas court found trial counsel's affidavits to be credible, emphasizing that trial counsel could not have "presented an alibi defense without suborning perjury in light of counsel's numerous discussions with [McGowen], counsel's investigation of the case, and [McGowen's] confession."  State Habeas Record at 394.  The state habeas court especially criticized the "hearsay and/or double hearsay renditions" in McGowen's affidavits, finding that "hearsay affidavits are not substantive evidence of anything; thus, they are not dispositive to any habeas allegations."  State Habeas Record at 395.  To that end, the state habeas court concluded:

> Counsel cannot be considered ineffective for an alleged failure to investigate and discover evidence which questioned [McGowen's] guilt and subsequent confession in light of counsel's thorough investigation of the facts of the offense, counsel's numerous discussions with [McGowen], counsel's challenge to [McGowen's] statement, the lack of credibility in [McGowen's] "postconviction" alibi, and the lack of evidence presented at trial, including [McGowen's] admission of going to the bar with the intent to rob, having a gun, and firing the gun.

State Habeas Record at 402.  The Court of Criminal Appeals rejected those findings because McGowen had not placed the claims before them in a procedurally adequate manner.  The Court does not presume that the lower court's findings are correct under 28 U.S.C. § 2254(e)(1).  That, however, does not prevent the Court from coming to a similar conclusion after a *de novo* review.

[23]        Kindle's statement is signed and dated, but not notarized.  The signature line of the statement gives his surname as "Kimble."

now claims that Charles McGowen claimed to be the shooter.

This is not the first time that Kindle and McGowen have traded accusations about who committed which offenses.  Kindle was convicted in state court for aggravated robbery and received a 25-year prison term.  In that case, which arose after the robbery victim "saw [Kindle] at McGowen's trial," the trial court would not allow into evidence a "bill of exceptions" in which McGowen claimed that his brother Charles possessed a crucial piece of evidence, though "he did not know who committed [that] offense."  *Kindle v. State*, No. 01-88-00499-CR, 1989 WL 8798 (Tex. App. –Houston [1sr. Dist.] 1989 pet. ref'd).  Sometime after McGowen's trial, Charles McGowen died in a shoot-out with the police.  Charles McGowen's death has made him an easy target upon which to cast blame.  Kindle now identifies Charles as the one who shot Ms. Pantzer. Because McGowen relies heavily on Kindle's account, as do other affiants, the Court will discuss his statement at length.

On May 10, 2001, Kindle signed a typed statement containing numerous handwritten additions and alterations.  In that statement, Kindle begins by stating that he "remember[s] the night that Marion Pantzer was shot, and [he] know[s] who did the shooting."  Kindle then navigates a careful path in relaying information.  He disclaims any knowledge "that may link [him] to the knowing the murder was going to be committed, or to [his] knowing that there was going to be a robbery of the club."  In essence, "nothing . . . is intended by [him] to admit any type of guilt in the robbery or murder of Marion Pantzer."[24]

---

[24]    At trial, Officer Maxey testified about how they linked Kindle to the crime:
McGowen brought up Kerwin's name originally when he told us Kerwin was his cousin.  Kerwin lived in an apartment with him.  During our conversation with him, we noticed there was listed one witness in the case that had been seen at the bar by the police officers there.  We brought that up.  We were wondering if his cousin was the same one that had showed up there at the scene, who found the bullet and handed it to the police officer.  It turns out that he just happened to be living with his cousin.
Tr. Vol. 33 at 143.

After that disclaimer, Kindle provides an account of the murder that differs significantly from the State's case at trial.  Kindle admits that on the night of the murder he was inside the club "playing pool with two women.  It was a gay club, for lesbian women.  I thought that one of the women looked good, and wanted to hit on her, that is, pick her up."  Kindle, however, does not admit that his presence in the club had anything to do with the subsequent robbery attempt.

Kindle states that McGowen's brother, Charles McGowen, later told him "that he entered the club to rob it as he had planned, but the woman shot at him so he shot back, and then ran out of the club."  Kindle says that when he saw Charles McGowen later that night "[h]e was bleeding . . . and was in pain" because "the woman . . . hit him in the leg, his thigh area."  "His wound was bleeding, but it was not life threatening.  [They] did not need to take him to the hospital.  [He was] sure the wound would have left a scar though."[25]  Kindle does not mention Williams, who claims that he rendered assistance to Charles McGowen on the night of the killing.  Kindle, however, reports that Charles McGowen told his brother "how he had accidentally shot the woman after she shot him."

Charles McGowen asked Kindle "about pain killers," and Kindle talked to his wife Shuntel Woolridge about giving him "some form of Tylenol."  He also told his wife that Charles McGowen "had robbed a place and shot someone."  He told her that Charles McGowen had committed the crime with someone named Robert Richmond.  While Kindle had been in the bar and returned later, he disclaimed any involvement in the robbery: "I never told [my wife] that I was involved.  I have never admitted that to anyone."

---

[25]     Debra Connelly, Charles McGowen's wife made a statement, which is signed and notarized, but not dated. She agreed that "[a]bout a year before his death Charles was shot in his leg, during a robbery.  I helped him take care of the wound."  Ms. Connelly crossed out the typewritten portion of the statement which had stated "He told me he got shot while he was robbing a bar.  There was only an entrance wound, not an entrance and exit wound.  There was no bullet in the wound, just a hole."  She would not state that Charles McGowen's gunshot wound did not contain a bullet.  She also could not verify exactly when McGowen was shot.

Kindle went back into the club that night.  He states that he "handed [the police] the bullet that had hit Charles in the leg.  The bullet was lying on the floor."[26]

The police questioned Kindle about the shooting weeks later.  According to Kindle, the police suspected that Kindle, along with Charles McGowen and Roger McGowen, were part of a group that had committed many robberies in the area.  Kindle "refused to give them a statement, but [he] did tell them that Roger [McGowen] had not committed the shooting."  Kindle states: "[The police] told me that Roger [McGowen] had said that he shot the woman, while he and I were trying to rob the club.  I didn't know why Roger [McGowen] was saying he did it, I could not understand why he was trying to protect Charles [McGowen] that way.  It did not make sense to me."

Kindle went on to speculate why McGowen confessed.  Kindle thought that McGowen may have felt depressed at the time.  Kindle also said that McGowen was "high when the police picked him up, and just told them what they wanted to hear. He was so high . . . he could have just agreed to anything they suggested.  He was high, very high."  In fact, "he was completely messed up.  He was sweating and acting odd. . . . He had been doing PCP . . .  He was full of dope . . . he could barely function."  Kindle did not know "how the police could have missed how high he was.  Perhaps they took advantage of him."  However, McGowen allegedly later told Kindle "that because his brother had killed someone before he thought his brother would get the death penalty if arrested in this case and because he had not been in any trouble, he would only get jail time.  He told [Kindle] the police had promised him if he confessed he would only get a few years, because the woman shot first."

Most of the other accounts McGowen relies on in his federal petition to prove his

---

[26]     At trial, Officer R.W. Bymaster with the Houston Police Department testified that Kerwin Kindle pointed out the bullet inside the bar.  Tr. Vol. 33 at 102-03.

innocence originate with Kindle.  Kindle's wife Shuntel Woolridge has provided a statement in which she states: "I remember the night [Kindle] got the call to take some Tylenol 3's to Charles McGowen, that was the same night the woman got killed in Montrose."[27]  She explained "I had some Tylenol 3's that had been prescribed to me for pain by a doctor.  Charles called and asked for something for pain.  [Kindle] left to take them to him."  Ms. Woolridge, however, could not provide a direct account of Charles McGowen's involvement.  She explained: "I really don't know anything other than what [Kindle] had told me."  She stated: "[Kindle] told me that Charles [McGowen] had been shot trying to rob some gay bar.  He also told me that on his way to give Charles [McGowen] the Tylenol 3's he had stopped by the gay bar.  He said when he got to the gay bar he saw a bullet on the floor, which he gave to the police."

Kindle's wife, however, could not place Charles' injury and Kindle's help into the timeframe of events surrounding the murder.  In her statement, Ms. Woolridge crossed out the typed statement that Kindle "had left earlier and been in the club all night[.]"  Instead, she wrote in that Kindle had "been with me all afternoon before that call came."  That statement conflicts with both the known sequence of events and with the otherwise-undisputed evidence that Kindle was in the club just before and after the robbery.[28]

McGowen's siblings heard from Kindle, either directly or indirectly, that Charles was the guilty one.  Kindle told McGowen's younger brother Michael Sean McGowen that Charles

---

[27]     Ms. Woolridge's statement is signed and notarized, but not dated.

[28]     Ms. Woolridge claims that she told the police that Charles McGowen told Kindle about the murder.  She claims that, when the police brought her in for questioning relating to this case, she told them: "I really didn't know anything, and that I didn't think [Kindle] was involved.  I also told them that I had heard from [Kindle] that Charles had shot the woman, who died, and that she had shot him first.  Her bullet had injured Charles' leg,"  She knew this because "[Kindle] and Roger both knew that Charles was the one who shot the woman.  I know that because I had heard them talk about this before that day, where Roger was arrested."  She stated: "I never told the police that the Tylenol 3's were for Roger, or that Roger had been injured in the shootout with the woman.  If they have that in their files they made a mistake, because that's not what I said.  I told them Charles did it, and Charles had been shot at the same time, and the Tylenol 3's were for him."

McGowen committed the murder.[29]  Ms. Ayers signed a second affidavit relating that Kindle told his mother that Charles McGowen was the killer:

> I had heard that Charles had committed the robbery, not Roger.  I heard it from [Kindle's] momma, Brenda, she told me that [Kindle] had told her about the shooting, but that Charles was the one who killed that woman.  She told me [Kindle] told her that Charles was involved in a lot of robberies.  I never got a chance to ask Roger before the trial if he had committed the robbery or Charles.  I just never believed that Roger did it.  I don't see how.  I think [Kindle's] momma told me about Charles doing the shooting before Charles died.  I am not sure if I believed her, or if she was just trying to protect [Kindle].

Norman Ray Willis Jr., a former accomplice of McGowen's in several robberies who testified against him in the punishment phase, also heard from Kindle that Charles McGowen was the killer.[30]  Willis tells how, while they were in a holding cell together before trial,[31] Kindle allegedly told Willis that Charles McGowen was the killer.  Successive State Habeas Record at 282.  Willis alleges that he told the prosecutor about this conversation with Kindle, though he was unsure of when it transpired.  Successive State Habeas Record at 283-84; State Habeas Record at 305.[32]  Even so, Willis still disparages Kindle and states "I think he was the one who killed that lady, the one [McGowen] was accused of killing."  Successive State Habeas Record at 281.

McGowen's sister Michelle D. Perkins says that she heard from "Uncle Jimmy" when he

---

[29]     Michael McGowen states:
> Charles [McGowen] and I never spoke about Roger [McGowen's] case.  But I did speak to Kerwin [Kindle] about it.  Kerwin [Kindle] told me Roger [McGowen] had nothing to do with the shooting.  I also spoke with my Uncles Jimmy and Henry, and they told me that Roger [McGowen] had confessed, but had told them that he did not commit the crime, Charles [McGowen] did.  I think this was after the trial but I can't be certain.  I wonder why Roger would cover for Charles.  I'm their brother too, but I don't know if I could do it.  But I know that Roger loved Charles very much. . . . I do remember talking to the police about Roger.  I think I may have told them that he could not have done this, but I can't remember exactly what I said to them.

[30]     While McGowen refers to Willis' account in his federal petition and filed his affidavit in state court, he has not included that affidavit as an exhibit in these proceedings.

[31]     Kindle had been arrested for armed robberies on September 16, 1986.  State Habeas Record at 362.

[32]     McGowen also claims that an eyewitness saw a masked man fleeing from the bar after the shooting, but said that it was not McGowen.  McGowen has not substantiated that allegation in federal or state court.

"got drunk" that Charles McGowen was the killer.[33]   According to Michael McGowen, McGowen himself is the one who passed that information on to "Uncle Jimmy."

Against that evidence, this Court must consider McGowen's argument that he has "a wealth of evidence that shows that his brother Charles McGowen committed the murder of Marion Pan[t]zer."  (Instrument No. 38 at 76).

### 3.      McGowen's failure to prove his innocence

McGowen has not met *Schlup*'s requirement that an inmate bring forth new reliable evidence from which it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt.  The validity of McGowen's confession frames his actual-innocence claim.   A signed statement conclusively admitting guilt places an inmate at a substantial disadvantage if he raises an actual-innocence defense.  McGowen's complaints hinge on his ability to discount his written statements to police officers.

McGowen claims that he has "presented here for the first time" an argument that his "will was overborne, five hours after being taken into police custody" when he "was high on PCP[.]" (Instrument No. 14 at 113).  McGowen ignores trial counsel's efforts to suppress his confession. Trial counsel challenged the voluntariness of McGowen's confession through a "Motion for Hearing on Voluntariness of Any Admission or Confession Whether Written or Oral."  Trans. at 57.  In the subsequent hearing, trial counsel vigorously challenged the constitutional integrity of

---

[33]      Ms. Perkins explained:
Charles was injured in early 1986, I think it was a few weeks before Roger went to jail.  But I am not sure of the exact date.  I think he was shot in the leg.  He said some, "mothafucka" shot him.  I saw the dressing.  But he never told me he robbed or killed any old woman.  Sometime after that and before Charles got killed, I remember Uncle Jimmy got drunk and started telling me that Charles murdered someone and Roger was taking the blame. . . . I never told that to anyone back then.  I didn't go to the trial, I was too messed up on drugs back then to have been anyone's witness.

McGowen's two statements to the police. [34]   Trial counsel argued that McGowen had used drugs before being taken into custody and that the circumstances showed that he was coerced into confessing.   The trial court issued written factual findings explicitly finding that McGowen's statements were voluntary and admissible.   The Court of Criminal Appeals rejected McGowen's challenge to the voluntariness of his confession on direct appeal.

On federal review, McGowen does not raise a claim that the police violated his constitutional rights when taking his statements.   McGowen's federal habeas petition does not ask this Court to vacate his conviction because his statement was not knowing and voluntary. He does not raise a ground for relief claiming that trial counsel provided ineffective assistance in their challenge to his written statements.   He does not ask this Court to evaluate the state courts' review of the statements.   Accordingly, the presumptive reliability of his confession hampers his efforts to prove his innocence.   This Court must weigh claims of innocence against the confession to the crime.

---

[34]       The testimony from the hearing showed that McGowen made a voluntary and knowing decision to confess. McGowen testified that, when he was arrested, he was "frightened" and "shaken up," but was cooperative.  Tr. Vol. 32 at 87.  A few hours before his arrest he and Kindle smoked marijuana joints laced with PCP.  Tr. Vol. 32 at 88, 106-08.  When asked if he understood what the police said to him, McGowen said: "Somewhat I was and somewhat I wasn't.  I was more hallucinogenic that anything."  Tr. Vol. 32 at 88.  Still, he said: "I thought I knew what I was doing."  Tr. Vol. 32 at 88.  When the police began interrogating him, he felt nervous and scared.  Tr. Vol. 32 at 95, 101.  While the police did not use any force against him, he still felt intimidated.  Tr. Vol. 32 at 95.  Officer R. L. Maxey, the Houston Police Officer who took McGowen's statement, testified that he did not see any indication that McGowen was under the influence of drugs.  Tr. Vol. 32 at 115.  Officer Maxey testified that McGowen did not have glassy eyes, was not hallucinating, was not incoherent, and did not seem intoxicated.  Tr. Vol. 32 at 115. Officer Maxey testified that they did not intimidate McGowen or make any improper attempt to solicit his confession unfairly.  Tr. Vol. 32 at 115-16.

Officer Maxey testified at trial about McGowen's arrest and interrogation.  When they went to McGowen's apartment, identified themselves, and arrested him, McGowen did not resist arrest.  Tr. Vol. 33 at 124.  Officer Maxey testified that "[h]e seemed surprised, but he didn't offer resistance and cooperated fully."  Tr. Vol. 33 at 137- 38.  McGowen indicated that he understood his rights when they were read to him.  Tr. Vol. 33 at 126.  At the police station, the police gave him soda and cigarettes when he asked for them.  Tr. Vol. 33 at 128.  He never asked for an attorney.  Tr. Vol. 33 at 128.  Officer Maxey began typing McGowen's statement at 11:00 p.m., five hours after his arrest.  Tr. Vol. at 129.  During the interrogation, he was scared.  Tr. Vol. 33 at 146.  Trial counsel moved for an instructed verdict "because the State has relied on a confession . . . that was taken involuntarily[,]" but did not provide a basis to question the voluntariness of the statement.  Tr. Vol. 33 at 154-55.  The strongest argument that the defense made was that, even though the police officers read McGowen his rights twice, they should have taken him before a magistrate before questioning him.  Tr. Vol. 33 at 199.

In addition, McGowen has not shown that his actual-innocence claim meets *Schlup*'s requirement that he produce reliable evidence.   The *Schlup* inquiry liberates a petitioner's argument from traditional rules of evidence.   The *Schlup* Court explained:

> In assessing the adequacy of petitioner's showing, therefore, the district court is not bound by the rules of admissibility that would govern at trial. Instead, the emphasis on "actual innocence" allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial.

*Schlup*, 513 U.S. at 327-28.   A petitioner, however, must still show that the evidence is credible and reliable.   *See id.* at 324 (giving as examples of *Schlup* evidence "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence"); *see also Moore v. Quarterman*, 534 F.3d 454, 464-65 (5th Cir. 2008) (rejecting a *Schlup* claim that "consist[ed] of hearsay within hearsay statements made by unidentified persons to unidentified [others] . . . and address matters which, by their very nature, were within the personal knowledge of the petitioner").   "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt."   *Schlup*, 513 U.S. at 329.   Under that standard, the Court will review McGowen's alleged innocence with respect to his alibi and identity defenses.

McGowen's professed alibi defense based on his presence at a birthday party lacks any colorable merit.   Ms. Ayers' first affidavit explained that March 11, 1986,  the day the victim was killed, was her birthday.   She stated: "On this day Roger was at my house with several other people[.]   We cooked a big meal and celebrated my birthday."   The murder for which a jury convicted McGowen happened at *12:45 a.m.* on March 11, 1986.   Ms. Ayers affidavit may correctly state where McGowen was during the *day*, but by no means attests to his location

during the early morning hours.[35]   Ms. Ayers testimony is irrelevant, and could possibly be harmful to the defense because the prosecution would argue that McGowen was unremorseful and attended a party soon after killing.   When Respondent has pointed out this discrepancy, McGowen has not shown that Ms. Ayers or anyone else could provide useful information about McGowen's whereabouts during the time the bar was being robbed.   No jury would find reasonable doubt as to his identity based on the purported alibi defense.

McGowen has also not brought forth reliable evidence that "more likely than not any reasonable juror would have reasonable doubt" about his identity as the killer.   *House*, 547 U.S. at 538.   Most of McGowen's proposed witnesses could only relate what they heard someone else say about the murder.   They give no reason to believe in the veracity of the rumors, especially when they conflictingly identify both  Charles McGowen or Kindle as the killer.   Ms. Ayers' first affidavit seemingly blames Kindle for the murder.   Ms. Foote heard that someone else killed the victim.   Shuntel Woodridge did not have any independent knowledge of the crime; she only knew what Kindle told her.   Even then, she did not think that Kindle was involved in any way.   "Uncle Jimmy," once drunk, would tell people that McGowen disclaimed responsibility for the killing.   Kindle also told Michael McGowen, Willis, and possibly his mother that Charles McGowen committed the murder.   Willis, nonetheless, believed that Kindle was the killer.   While McGowen has woven together various rumors about who actually killed the victim, he has not brought forward witnesses who could give credible testimony.

Some individuals have said that Charles McGowen had been shot at some point.

---

[35]      An affidavit from the state habeas investigator provided a hearsay statement that "Ms. Ayers . . . related that he was with the family at a birthday dinner on the night the offense occurred."   She also states that the McGowen's sisters (Deborah McGowen and Cheryl McGowen) identified by Ms. Ayers as also being at the birthday dinner "related that, on the night of the murder, Roger was with the family at a birthday dinner.   He then went with several of the family to get the children's hair cut by a friend."   Taken together, the statements may show that McGowen was at a birthday dinner on March 11, his sister's birthday, but does not show that he was with family and then went to get children's hair cut at 12:45 a.m.

Michelle D. Perkins remembered that Charles McGowen had once been shot, but had only heard from an uncle that he was the killer in this case. Charles McGowen's wife remembered that he had been shot during a robbery, but did not provide any specific information about when the injury occurred. Both Kindle and Williams said that they saw Charles McGowen with a gunshot wound on the night of the murder, allowing for the inference that he had been shot during the attempted robbery.[36] Testimony from these witnesses' testimony does not meet the high standards required for an actual-innocence claim.

Williams states that he could testify that he saw Charles McGowen after he had been shot in the thigh.[37] Williams does not say that Charles McGowen confessed to killing Ms. Pantzer. Williams' affidavit assumes that the injury came from the robbery for which McGowen confessed. The information Williams could provide is limited and inferential. Given the other affiants' testimony that Charles was particularly violent and predisposed to crime, the fact that Charles was shot does not show McGowen's innocence without something proving when, why, and how he received his wound.

In particular, Williams' supposition that Charles McGowen received his wound while robbing the bar is speculative when compared to the evidence. Kindle found the slug Ms. Pantzer fired from her gun. The autopsy describes a wound in Charles McGowen's thigh, but does not show a corresponding exit wound. Unless the bullet struck Charles McGowen and then fell to the floor, the assailant (if injured at all) would have received a through-and-though wound.

---

[36] McGowen does not suggest that trial counsel should have called Charles McGowen as a witness to testify about his own culpability. It would not be reasonable to assume that Charles McGowen would confess on the stand. Charles McGowen allegedly told Joe E. Williams and Kindle that he was shot in the thigh during a robbery, which would be an inadmissible hearsay statement at trial, especially since Charles had not yet been killed by the police.

[37] Charles McGowen's wife, Debra Connelly, states that "[a]bout a year before his death Charles was shot in his leg[.]" However, she does not indicate that it was on March 11, 1986. Further, she redacted the portions of the typed affidavit that would have linked her husband to the crime. She does not indicate whether she would have provided incriminating testimony against her husband if trial counsel called her as a witness.

McGowen has not pointed to anywhere in the record showing that the assailant left blood on the floor. The record does not mention a trail of blood left by a fleeing gunman. The question of whether the gunman was even injured is important, as no witness testified that the masked man staggered away in pain. Serious questions vex McGowen's claim that his brother was injured robbing Ms. Pantzer's bar.

As previously discussed, Kindle is the only individual claiming that Charles McGowen personally admitted that he tried to rob Ms. Pantzer's bar. Kindle provides the only information which fills the holes in McGowen's argument. Kindle is not a credible source of information. At the time of trial, Kindle was under arrest for committing armed robbery with McGowen. His affidavit cautiously attempts to disclaim any role in the killing, a fact in direct contradiction to McGowen's signed police statement. Kindle had, and still has, incentive for diffusing his role in the murder, especially since some individuals still attribute the murder to him. Both McGowen and Kindle have a good reason to spread the word that the killer was Charles, and those who now relay that information have not validated it by any other means.

Importantly, Kindle's statement and the other accounts cannot exist in isolation. *See House*, 547 U.S. at 537 (stating that "the habeas court must consider all the evidence, old and new, incriminating and exculpatory"). McGowen's confession glaringly cuts against his claim of actual innocence. As previously discussed, McGowen makes several arguments about why his statement is unreliable. He has, however, not provided any evidence to call into question the state court's determination that he knowingly and voluntarily chose to confess. McGowen's claims of innocence ring hollow when compared to his valid confession that he and Kindle committed the crime. Kindle's attempts to spread the blame for the murders do not call into question McGowen's confession, no matter how many people he told. Any reasonable juror

considering the weak, unproven, or self-serving allegations supporting McGowen's *Schlup* claim would still find him guilty beyond a reasonable doubt.

On federal habeas review, the presumption of innocence has run its course and McGowen appears as one lawfully convicted. McGowen has not "demonstrated to the state that his brother Charles was the person who committed the shooting of Ms. Pantzer." (Instrument No. 14 at 2). At best, McGowen has shown that rumors alternatively attributed the murder to his brother and to Kindle, and that Kindle has freely drawn attention away from himself by telling people that the man who has implicated him in the robbery was not the one who committed the murder. This is not the extraordinary case where an inmate has "demonstrate[d] that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt." *House*, 547 U.S. at 538.

Accordingly, the Court finds that adequate and independent state law bars federal consideration of his remaining claims. Habeas review and relief is unavailable on those issues.

## III.   Alternative Merits Review of Defaulted Claims

Notwithstanding the fact that McGowen failed to give the state courts an adequate opportunity to address his procedurally deficient claims, and has not shown any mechanism by which federal relief is available, the Court will briefly address the merits of his claims in the alternative. The Court finds that, even if McGowen's claims attacking his conviction were properly before the Court, he does not merit habeas relief.

### A.   *Strickland* Claim

McGowen's allegations that trial counsel ineffectively asserted his innocence spring from the tangled web of accusations derived from affidavits he procured well after trial. Because McGowen's culpability centered on his confession, his accusations against trial counsel rest on

the paucity of evidence pointing to his guilt.   However, as the Court will discuss below, McGowen's claim, and his arguments, have evolved over time.

On state habeas review he faulted trial counsel for not calling three witnesses, each of whom would have supported a different defensive theory.   One proposed witness would have provided an alibi without identifying who shot the victim, another would blame the crime on McGowen's brother, and a third would accuse his cousin Kerwin Kindle.   On federal review, McGowen's claim has both expanded in the number of witnesses he wishes that trial counsel had called and has narrowed in defensive focus.   McGowen now only accuses his brother Charles McGowen of being the killer.   As the Court will discuss at length below, McGowen has not shown that his attorneys performed deficiently or that their chosen strategy actually prejudiced his defense.

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."   *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Under the *Strickland* standard, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense."   *Yarborough v. Gentry*, 540 U.S. 1, 3, (2003); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).   "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim."   *Strickland*, 466 U.S. at 700.   The Court does not consider an inmate's *Strickland* claim in a vacuum.   "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."   *Strickland*, 466 U.S. at 695.   "*Strickland* places the burden on the defendant, not the State, to show a 'reasonable

probability' that the result would have been different." *Wong v. Belmontes*, ___ U.S.___. 130 S. Ct. 383, 390-91 (2009).

The Court must decide whether trial counsel provided ineffective, prejudicial assistance by not forming a defense based on the information contained in the written statements described above. McGowen makes several arguments, many of which lack adequate evidentiary support, to denigrate the validity of his written statement. McGowen relies on affidavits to speculate that he was lying when he confessed, but provides no strong reason to question the validity of his written statement to the police. Trial counsel unsuccessfully tried to keep that statement from coming before the jury. Once the statement came in, trial counsel would have to choose between maintaining innocence and seeking some other means of lessening culpability. Here, trial counsel chose to emphasize that his client did not intend to kill, but fired his weapon as a split-second response to being fired upon. McGowen concedes that this strategy was not in error or incompatible with his proposed innocence defense. McGowen instead complains that trial counsel did not pursue a sufficient investigation to exclude a defense that challenged his identity as the killer. Given the validity of McGowen's confession, trial counsel could reasonably choose to focus on challenging his intent to kill rather than investigate possible alibis which may not be true.

The affidavits that trial counsel submitted in McGowen's initial state habeas proceeding explain why they did not challenge his identity as the murderer. Trial counsel had no reason to doubt the validity of the statements in McGowen's confession. In fact, McGowen "never denied the allegation that he shot the complainant[.]" State Habeas Record at 166. Trial counsel's affidavits show that they felt limited in their ability to assert innocence because of his confession. In fact, Mr. Mock's statement "I could not have presented an alibi defense without suborning

perjury" strongly suggests that in their interaction with McGowen he confessed his guilt.  State Habeas Record at 170.  McGowen has not presented an affidavit or any other evidence that would show that he gave any indication to his attorneys that he was not the shooter.

Even if trial counsel should have performed an investigation that would have resulted in the information he has secured after trial, McGowen has not shown that trial counsel would have changed his litigation strategy. McGowen claims that the post-trial affidavits show "that he did not commit this crime . . . who actually committed the crime . . . who shot the decedent . . . how the assailant was himself shot[.]"  (Instrument No. 14 at 114).  McGowen overstates the evidentiary value of the affidavits he has adduced in state and federal court, both insofar as they support an alibi defense and pin the murder on his brother Charles.  Most of the individuals who have provided post-trial statements only relate what someone else – usually Kindle – told them. As noted by Respondent, "McGowen completely fails to address the hearsay nature of his evidence.  He offers no argument as to how this evidence could conceivably have been admissible under the Texas Rules of Evidence.  No possible explanation exists to allow the double and triple hearsay statements contained in the majority of the affidavits."  (Instrument No. 33 at 77).

Trial counsel could not call the affiants as witnesses because they had no personal knowledge to convey.  McGowen does not suggest any hearsay exception or other evidentiary principle that would allow the testimony to come before the jury.  McGowen has not shown how trial counsel could turn this muddled maze of hearsay into admissible trial testimony.  Trial counsel cannot be ineffective for not developing evidence that he could not present at trial.

Even those who could provide admissible testimony could not be counted on to testify. As discussed at length above, McGowen's innocence would depend on Kindle's testimony.

McGowen inculpated Kindle in the robbery which led to the murder.  McGowen, in fact, seeks to excuse the procedural bar of other claims because only recently "Kindle changed his mind about assisting in this case, during the federal habeas process."  (Instrument No. 38 at 86).  Kindle would not have testified at trial.  Even if trial counsel had called Kindle as a witness and he chose to relate the information from his habeas statement, the prosecution would surely impeach him with McGowen's written statements, arguing that Kindle only wanted to shift the blame from himself.  McGowen has not shown that additional trial investigation into Kindle would have led to testimony that would be both admissible and credible.

Even so, McGowen's confession cripples any defense built on his innocence.  The Constitution requires a trial attorney to engage in a probing investigation into possible defenses.  The discrete circumstances of a case and an attorney's interaction with his client certainly inform that investigation.  Here, trial counsel tried to ameliorate the defense's position by removing the confession from the jury's consideration.  Trial counsel was unsuccessful.  Then, trial counsel adopted the strategy of challenging McGowen's intent, rather than his commission of the crime.  Had trial counsel tried to question his identity, the record does not suggest that he could have convinced a jury to disregard his client's own words.  Even if trial counsel presented the only admissible information flowing from the post-trial affidavits – that his brother suffered a gunshot wound around the time of the robbery – McGowen has not shown that the jury would have found him not guilty.  McGowen's confession eviscerated any proposed defense based on innocence.

As McGowen has not met the *Strickland* performance or prejudice prongs, the Court will deny McGowen's ineffective-assistance-of-counsel claim.

B.      Actual Innocence

Based on the same affidavits he relies on to support his ineffective-assistance-of-counsel

claim, McGowen raises his actual innocence as a ground for relief.  A person who stands trial enjoys a presumption of innocence, and the State must prove his guilt beyond a reasonable doubt.  "Society's resources have been concentrated at [a criminal trial] in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens." *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977); *see also McFarland v. Scott*, 512 U.S. 849, 859 (1994) (stating that a "criminal trial is the 'main event' at which a defendant's rights are to be determined").  But "[o]nce a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears."  *Herrera v. Collins*, 506 U.S. 390, 399 (1993).  Thus, by the time an inmate invokes federal habeas jurisdiction he "comes before the habeas court with a strong – and in the vast majority of the cases conclusive – presumption of guilt."  *Schlup*, 513 U.S. at 326; *see also Herrera*, 506 U.S. at 399-400 (stating that a petitioner "does not come before the Court as one who is 'innocent,' but, on the contrary, as one who has been convicted by due process of law"); *Bosley v. Cain*, 409 F.3d 657, 664 (5th Cir. 2005) ("[T]here is no presumption of innocence at a habeas proceeding.").

Accordingly, the Supreme Court has not accepted actual innocence as a cognizable ground for habeas corpus relief.  In *Herrera*, the Supreme Court stated that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." 506 U.S. at 400.  Similarly, in *Schlup*, the Supreme Court again noted that a petitioner's "claim of innocence does not by itself provide a basis for relief."  513 U.S. at 315. Following that reasoning, the Fifth Circuit has repeatedly and unequivocally held that the Constitution does not endorse an independent actual-innocence ground for relief.  *See Foster v. Quarterman*, 466 F.3d 359, 367 (5th Cir. 2006); *Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir.

2003); *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000); *Graham v. Johnson*, 168 F.3d 762, 788 (5th Cir. 1999); *Robison v. Johnson*, 151 F.3d 256, 267 (5th Cir. 1998); *Lucas v. Johnson*, 132 F.3d 1069, 1074-75 (5th Cir. 1998).  Simply, "[f]ederal courts are not forums in which to relitigate state trials." *Barefoot*, 463 U.S. at 887.

As it currently stands, federal law defers to a jury's finding of guilt. The Fifth Circuit has observed that, even if an actual-innocence constitutional claim existed, the petitioner would have to meet an "extraordinarily high threshold" by showing:

> (1) the evidence is newly discovered and was unknown to the defendant at the time of the trial; (2) the defendant's failure to detect the evidence was not due to a lack of diligence; (3) the evidence is material, not merely cumulative or impeaching; and (4) the evidence would probably produce acquittal at a new trial.

*Lucas*, 132 F.3d at 1076 (citation omitted); *see also Bell v. Cockrell*, 310 F.3d 330, 335 (5th Cir. 2002).  For the same reasons discussed at length above, McGowen has not met the extremely high showing required for a hypothetical actual innocence claim.

C.     *Brady* Claim

McGowen claims that the State failed to disclose exculpatory information in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  Three essential elements compose a valid *Brady* claim: "'The evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'"  *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).  Cases often add a fourth requirement: "nondiscovery of the allegedly favorable evidence was not the result of a lack of due diligence."  *United States v. Walters*, 351 F.3d 159, 169 (5th Cir. 2003); *see also Graves v. Cockrell*, 351 F.3d 143, 153-54 (5th Cir. 2003).  "When evidence is equally available to both the defense and the prosecution, the defendant must bear the responsibility for failing to conduct a

diligent investigation." *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002). McGowen focuses his claim on three sources: (1) Shuntel Woolridge's claim that she told the police that Charles McGowen, not her husband Kindle and McGowen, killed Ms. Pantzer; (2) police reports which may have shown that someone else was seen fleeing the scene or was believed to be the killer; and (3) Norman Willis' statement that he told a prosecutor that Kindle has been the shooter. McGowen admittedly bases this claim only on "information and belief." (Instrument No. 14 at 122 n.38). McGowen's *Brady* claim is procedurally barred and speculative.

McGowen first raised his *Brady* claim in his successive state habeas application. The Court of Criminal Appeals rejected it as an abuse of the writ. As previously discussed, McGowen's actual-innocence argument cannot overcome the resultant procedural bar. McGowen makes other arguments, such as that the alleged *Brady* material was previously unavailable, his state post-conviction attorneys provided ineffective assistance, information only became available when Kindle recanted, and he only recently found Willis, who is allegedly "in the witness protection program, being housed in a prison in Maryland under a different name." (Instrument No. 38 at 86). Insofar as McGowen alleges that the prosecution suppressed evidence that should have been in the police file, he has not shown that was not discoverable until after state habeas review ran its course. Moreover, has not shown that witnesses such as Ms. Woolridge could not have provided information earlier. Ms. Woolridge explicitly states that she "was not contacted by [McGowen's] attorneys. If I would have, I would have told them what I am saying now, and what I told the police back then, that Charles did it." Successive State Habeas Record at 266. Willis makes a similar statement. McGowen has presented no proof that he could not have obtained a similar statement from Willis had he investigated that issue at trial. McGowen has not made a convincingly shown "cause" by proving that his *Brady* claim was

unavailable until this late in the process.  This Court cannot reach the merits of McGowen's *Brady* claim.

The Court notes, however, that McGowen's *Brady* claim rests entirely on speculation. Because McGowen did not present this claim in his initial state habeas application, trial counsel's affidavits do not respond to it.  McGowen has never presented any direct evidence that the defense did not or could not know about the alleged *Brady* material.  McGowen assumes that, because his defense attorneys did not develop the alleged *Brady* material, it was not in the police file.  McGowen has not provided the relevant police records in either federal or state court.  He has only assumed that his attorneys were never shown the information without acknowledging that other reasons could exist for trial counsel not to have presented it at trial.[38]  For instance, trial counsel may have missed the importance of the statements through oversight.  Trial counsel may have decided not to investigate the information because it conflicted with McGowen's valid confession and his statements to them.  Trial counsel's familiarity with the case may have shown that the statements were not credible, such as, for instance, statements by Kindle's wife that cast the blame on others.

Even so, much of the alleged *Brady* information is fatally flawed in the same manner as that which he relies on to prove his innocence.  The police reports would mostly lead to hearsay

---

[38]    McGowen assumes that the police suppressed reports containing information from Dennis McCowen, mainly because trial counsel did not mention it in their affidavits.  McGowen states: "Because of the affidavits of trial counsel it is also reasonable to assume that at the time that [trial counsel] read the state's files that the exculpatory evidence from and about Shuntel Woolridge and Dennis McCowen was not part of the files they were allowed to see."  (Instrument No. 14 at 122).  McGowen has not submitted the police reports which he claims will exculpate him or pointed out their location in the record.  He does not include that, or any, police report in his list of "evidence in support of the petition."  (Instrument No. 14 at 28).  Likewise, McGowen discussed the police reports in state court, but did not submit them for judicial review.  In the end, the content of the reports is secondary. McGowen has made no showing that the State in any way made them unavailable to him.  This Court need not develop the merits of a claim that is both procedurally barred and based entirely on speculation.  The burden is on McGowen to prove his claims.

statements that someone else may have committed the murder.[39]   Willis and Ms. Woodridge mostly relate information that Kindle told them.   McGowen has not shown that the statements would have led to an investigation that would have turned up admissible evidence.   For the same reasons that the Court has already resolved the related ineffective-assistance-of-counsel issues adversely to McGowen, the Court will deny this claim.   *See Johnson v. Scott*, 68 F.3d 106, 109-10 (5th Cir. 1995) (finding that the standard for materiality under *Brady* is "identical to" the standard for prejudice under Strickland)

In the end, McGowen bears the burden of proving his entitlement to habeas relief. McGowen has not shown that his *Brady* claim is procedurally actionable or that is consists of anything but speculation.   The Court will deny McGowen's *Brady* claim.

    D.    Cumulative Error

McGowen claims that, taken together, his constitutional claims amount to cumulative error.   Federal review of that claim is barred as McGowen has not exhausted it.   Even so, cumulative-error claims are predicated on the finding of error to aggregate.   Taking into consideration all of the allegations in McGowen's petition, this Court cannot say that any error – taken either individually or as a whole – rendered his conviction infirm.

## CERTIFICATE OF APPEALABILITY

The AEDPA prevents appellate review of a petitioner's claims unless the district or circuit courts certify specific issues for appeal.   *See* 28 U.S.C. § 2253(c); FED. R. APP. PRO. Rule

---

[39]    For instance, McGowen claims that "[t]he state failed to disclose the information provided by Shuntel Woolridge that she was a witness who would say that Charles McGowen and Robert Richmond were involved in the death of Marion Panzer."  (Instrument No. 14 at 122).  Actually, all Woolridge could tell the police is what Kindle told her.  She had no independent knowledge of who committed the murder.  To the extent that she actually told the police what she alleged in her affidavit, that information could not be used by the defense.  Any attempt to call her as a witness would have been met by a valid hearsay challenge.  To the extent that Ms. Woolridge could have provided some information about Charles McGowen being shot, this Court has already addressed McGowen's claim that trial counsel should have called her as a witness.  Because *Strickland* prejudice corresponds to *Brady* materiality, *see Gonzales v. Quarterman*, 458 F.3d 384, 390 (5th Cir. 2006) ("The test for prejudice under *Brady* and *Strickland* is the same."), the Court will summarily deny his *Brady* claim based on the same information.

22(b).  The State, however, does not need judicial authorization to appeal.  FED. R. APP. PRO.

Rule 22(b)(3) ("A certificate of appealability is not required when a state or its representative or

the United States or its representative appeals.").  McGowen has not yet requested that this Court

grant him a Certificate of Appealability ("COA") on his guilt/innocence claims, though this

Court can consider the issue *sua sponte*.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir.

2000).  A court may only issue a COA when "the applicant has made a substantial showing of

the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529

U.S. 473, 484 (2000).  Under the appropriate standard, McGowen's claims do not require

appellate consideration.  This Court will not issue a COA.

## CONCLUSION

For the reasons described above, the Court orders as follows:

1.    The Court **DENIES** Respondent's summary judgment in part and **GRANTS** summary judgment in part.  The Court grants Respondent's motion for summary judgment only with respect to the guilt-innocence phase claims.

2.    The Court conditionally **GRANTS** a writ of habeas corpus on McGowen's *Penry* claim.  A writ of habeas corpus shall issue unless within 180 days the State of Texas either begins new sentencing proceedings against McGowen or reforms his sentence to life imprisonment.  The 180-day time period shall not start until the conclusion of any appeal from this Memorandum and Order, either by the exhaustion of appellate remedies or the expiration of the time period in which to file such appellate proceedings.

3.    The Court denies any other outstanding motions.

4.    The Court will not certify any issue for appellate consideration.

The Clerk will deliver a copy of this Order to the parties.

SIGNED at Houston, Texas, this 25th day of March, 2010.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE